INTERSTATE COMMERCE COMMISSION ET AL.
*v.* AMERICAN TRUCKING ASSOCIATIONS,
INC., ET AL.

No. 82–1643.   Argued January 10, 1984—Decided June 5, 1984

Carter G. Phillips argued the cause for petitioners. On the briefs were *Solicitor General Lee, John Broadley,* and *Lawrence H. Richmond.*

*Patrick McEligot* argued the cause for respondents. With him on the brief were *Bryce Rea, Jr., Nelson J. Cooney, William Kenworthy, F. H. Lynch, Jr., William W. Pugh, J. Alan Royal, Robert A. Wilson,* and *Curtis Wood.** 

JUSTICE MARSHALL delivered the opinion of the Court.

This case presents a challenge to an effort by the Interstate Commerce Commission to create a new remedy to enforce motor-carrier rate-bureau agreements. The remedy at issue is the Commission's authority to reject effective tariffs that have been submitted in substantial violation of rate-bureau agreements. As we have recognized in the past, the Interstate Commerce Commission (Commission or ICC) has discretion to fashion remedies in furtherance of its statutory responsibilities. *Trans Alaska Pipeline Rate Cases,* 436 U. S. 631, 654 (1978). Although rejection of effective tariffs is a form of remedial power not expressly delegated to the Commission, the remedy as proposed by the Commission in this case is closely and directly related to the Commission's express statutory powers and is designed to achieve objec-

---

*Michael Boudin, Stuart C. Stock, Albert B. Russ, Jr., Harry N. Babcock,* and *Harry McCall, Jr.,* filed a brief for Aberdeen and Rockfish Railroad Co. et al. as *amici curiae* urging affirmance.

tives set for the Commission by Congress. Under these limited circumstances, we hold that the proposed remedy lies within the Commission's discretion.

## I

Motor-carrier rate bureaus are groups of motor carriers formed to negotiate collective rates. Since the Reed-Bulwinkle Act of 1948, motor carriers within the jurisdiction of the Commission have enjoyed immunity from the antitrust laws to enter into rate bureaus and to submit collective rates to the Commission. Ch. 491, 62 Stat. 472. To receive this immunity, rate bureaus must apply for Commission approval of bureau agreements, which describe the manner in which a bureau will negotiate collective tariffs. The original Reed-Bulwinkle Act gave the ICC broad discretion to determine which rate-bureau agreements were consistent with national transportation policy. 49 U. S. C. § 5 (1976 ed.). Until recently, the Commission was fairly liberal in approving rate-bureau agreements, but, in the late 1970's, the Commission began to disapprove an increasing number of agreements on the grounds that the agreements were undermining competition among motor carriers. In 1980, apparently disturbed by this abrupt shift in Commission policy but persuaded that some deregulation of motor carriers was necessary, Congress passed the Motor Carrier Act of 1980 (MCA). Pub. L. 96–296, 94 Stat. 793. The MCA in 49 U. S. C. § 10706(b)(3) establishes specific guidelines, to which rate-bureau agreements must conform if they are to receive antitrust immunity.[1] Because the MCA creates a presumption that bureau

---

[1] The guidelines set disclosure requirements for rate agreements, sunshine rules for bureau meetings, and limitations on the issues that bureau members may discuss. 49 U. S. C. §§ 10706(b)(3)(A), (B). The most significant deregulatory aspect of the guidelines is a ban on discussions of tariffs applicable solely to individual carriers. § 10706(b)(3)(D). The scope of collective ratemaking permitted under the MCA is summarized in H. R. Rep. No. 96–1069, pp. 29–30 (1980).

agreements meeting the requirements of § 10706(b)(3) will qualify for antitrust immunity, the Act divests the Commission of much of its discretion to approve and disapprove rate-bureau agreements. See H. R. Rep. No. 96–1069, p. 29 (1980).

This case arises out of an ICC interpretative ruling issued in 1980 explaining how the Commission planned to implement the new statutory guidelines for rate-bureau immunity. *Motor Carrier Rate Bureaus—Implementation of P. L. 96–296*, 364 I. C. C. 464 (1980). For the most part, this interpretative ruling presented the Commission's views on the substance of the new legislation, and established procedures whereby rate bureaus could submit existing agreements to the Commission for approval under the new standards. Before concluding, however, the ruling also addressed a problem the Commission had faced in regulating rate-bureau agreements even before Congress in 1980 amended the Reed-Bulwinkle Act: "the lack of definite remedies for proven rate bureau violations." *Id.*, at 499. The Commission announced its intention to fashion the following new remedy:

> "In addition to the possible remedy of withdrawal of immunity for serious and continuing violations, we proposed to adopt a standard providing that proof of significant violations of an approved agreement will result in tariff rejection. Allegations of lesser violations would subject the tariff item to suspension or investigation." *Ibid.*

The Commission subsequently explained how its new remedy would be implemented.[2] The Commission intends to use the remedy to discipline motor carriers for substantial bureau agreement violations, such as unauthorized collusion or illegal bureau pressure on independent carriers. Brief for

---

[2] The Commission explicated its proposed remedy in orders issued on January 28, 1981, and April 27, 1981. See Record 375, 381; *Motor Carrier Rate Bureaus—Implementation of P. L. 96–296*, 364 I. C. C. 921, 927.

Petitioners 24. Interested parties—for instance, shippers or other carriers—may file complaints of such violations with the Commission. Upon receiving such a complaint, the Commission's Office of Consumer Protection will investigate the allegations, and, if a serious violation is discovered, the Office will refer the matter to the Commission for a full hearing. If the hearing confirms that a serious violation has occurred, the Commission has the authority to reject the affected tariffs. The Commission's decision to reject is reviewable in federal court. *Motor Carrier Rate Bureaus—Implementation of PL 96–296*, 364 I. C. C. 921, 926 (1981).

Rejection of an effective tariff applies retroactively, and can have serious consequences for affected motor carriers. Rejection renders the tariff void *ab initio*. Brief for Petitioners 7. As a result, whatever tariff was in effect prior to the adoption of the rejected rate becomes the applicable tariff for the period during which motor carriers charged the rejected tariff. Under 49 U. S. C. § 11705(b)(1), shippers that were charged the rejected tariff can then bring actions to recover the "overcharge," which is the amount by which the rejected tariff exceeded the prior tariff.

Alarmed by the prospect of overcharge liability, respondents, a group of motor-carrier rate bureaus, petitioned the United States Court of Appeals for the Eleventh Circuit to review the Commission's new remedy. The Eleventh Circuit accepted respondents' argument that the Commission lacks the power to reject effective tariffs. *American Trucking Assn., Inc. v. United States*, 688 F. 2d 1337 (1982). Because the Fifth Circuit previously had found the Commission to possess authority to reject effective tariffs in a different context, *Aberdeen & Rockfish R. Co. v. United States*, 682 F. 2d 1092 (1982), cert. pending, No. 82–707, we granted certiorari in this case to examine the Commission's powers to reject effective tariffs. 462 U. S 1130 (1983). We now reverse the judgment of the Eleventh Circuit.

## II

The issue before us is narrow. Most aspects of the Commission's authority to supervise motor-carrier rate-bureau agreements are not seriously challenged. For example, the Commission undisputedly has the power to terminate a rate-bureau agreement if the agreement itself fails to meet MCA guidelines or if bureau members persist in filing tariffs in violation of the terms of the agreement. 49 U. S. C. § 10706(f). Moreover, during the 30 days before a tariff proposed by a bureau member goes into effect, the Commission clearly has authority to reject the proposal if it was submitted in violation of a rate-bureau agreement.[3] 49 U. S. C.

---

[3] Respondents contest this point. In an argument repudiated by the Eleventh Circuit, *American Trucking Assn., Inc.* v. *United States*, 688 F. 2d 1337, 1353 (1982), respondents contend that under § 10762(e) the Commission is empowered to reject a tariff only when the application therefor contains a formal, as opposed to a substantive, defect. We decline to read § 10762(e) so narrowly. As the District of Columbia Circuit noted in a similar context: "[Rejection] is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket." *Municipal Light Boards* v. *FPC*, 146 U. S. App. D. C. 294, 299, 450 F. 2d 1341, 1346 (1971), cert. denied, 405 U. S. 989 (1972); see also *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 676 F. 2d 1374, 1377 (CA11 1982) (amended opinion); cf. *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.*, 350 U. S. 332, 347 (1956).

Respondents also argue that, even if § 10762(e) extends to substantive defects, it should not apply to violations of rate-bureau agreements because the ICC's sole remedy for such violations is termination of agreement approval under 49 U. S. C. § 10706(f). While the ICC has the option to terminate agreement approval under § 10706(f), see *supra* this page, Congress has expressly provided that powers enumerated in the Interstate Commerce Act do not preclude the Commission from taking other actions consistent with its statutory duties. § 10321(a). Since the Commission has a statutory duty to supervise rate-bureau agreements, see *supra*, at 356–357, we agree with the Eleventh Circuit that it is a perfectly reasonable exercise of administrative authority for the Commission to

§ 10762(e).  In addition, if the Commission suspects that a proposed tariff has been submitted in violation of a rate-bureau agreement but no violation is immediately evident, the Commission may postpone the tariff's effective date for up to seven months, and conduct an investigation into its lawfulness.  § 10708.  If the investigation uncovers a rate-bureau agreement violation before the suspension period expires, the Commission may reject the proposed tariff. Furthermore, the Commission may conduct an investigation into a tariff's lawfulness at any time after it has gone into effect, and, if the tariff is found to have been the product of a bureau agreement violation, the Commission has authority to cancel the tariff and require that a reasonable and nondiscriminatory rate apply in the future.  § 10704(b)(1).  Whenever the Commission finds an effective tariff unlawful, injured parties can recover both damages under § 11705(b)(3) and whatever additional amounts the antitrust laws allow. Finally, the Commission has authority to impose civil and criminal penalties on rate agreement violators.  §§ 11901(b), 11914(b).

Our sole concern in this case is whether, in addition to the remedial powers listed above, the Commission has the authority to reject retroactively a tariff submitted in substantial violation of a rate-bureau agreement once that tariff has gone into effect.[4]  As a practical matter, the question is whether motor carriers that provide services based on effec-

---

refuse to accept proposed tariffs submitted in violation of rate-bureau agreements.  688 F. 2d, at 1352–1353; cf. *Board of Trade* v. *ICC*, 646 F. 2d 1187, 1193 (CA7 1981) (Commission is obliged to reject such tariffs).

[4] Prior to 1979, the Commission had no need to reject effective tariffs, because the Commission's staff examined every filing prior to the effective date of the proposed tariff and, if an obvious defect was discovered, the tariff was rejected immediately.  In 1979, however, budgetary cutbacks forced the Commission to abandon its comprehensive examination program.  Since then, the Commission has reviewed only a random sampling of tariff filings, and tariffs with obvious defects inevitably are permitted to go into effect.  See *Southern Motor Carriers Rate Conference, Inc.* v. *United States, supra,* at 1376–1377.

tive tariffs submitted in substantial violation of rate-bureau agreements can be held liable to injured parties for the entire amount by which their rates exceed the previous rates, and not just for the damages caused by the violation.[5]

## A

Since the Commission styled its new remedy as a rejection power, the most obvious source of the authority claimed by the Commission is 49 U. S. C. § 10762(e), which provides:

> "The Commission may reject a tariff submitted to it by a common carrier under this section if that tariff violates this section or regulation of the Commission carrying out this section."

At least superficially, § 10762(e) supports the Commission's exercise of the power it asserts in this case. The subsection authorizes the rejection of tariffs, and does not distinguish between proposed and effective tariffs. Inasmuch as Congress in other contexts has expressly limited aspects of the Commission's enforcement powers to proposed tariffs, e. g., 49 U. S. C. § 10708(a)(1) (suspension of proposed rates), the absence of limitation in § 10762(e) suggests that the Commission may reject both proposed and effective tariffs. However, the language of § 10762(e) and the structure of the Commission's remedial authority under the Interstate Commerce Act (ICA), as amended, 49 U. S. C. § 10101 et seq., persuade us that Congress could not have meant § 10762(e) to confer on

---

[5] The difference can be significant for carriers. In suits under 49 U. S. C. § 11705(b)(3), damages awards are limited to the extent to which an unlawful tariff was unreasonable or discriminatory. See *Spencer Plant Foods, Inc.* v. *Atlantic Coast Line R. Co.*, 302 I. C. C. 799, 800 (1958); *Boren-Stewart Co.* v. *Atchison, T. & S. F. R. Co.*, 196 I. C. C. 120, 125–126 (1933). Accordingly, if a motor carrier submits a large tariff increase in violation of its rate-bureau agreement, but the increase is neither unreasonable nor discriminatory, application of the Commission's proposed remedy will expose the carrier to liabilities greatly in excess of the damages available under § 11705(b)(3).

the Commission a broad power to nullify effective tariffs retroactively.

To begin with, the term "reject" connotes a refusal to receive at the threshold. To interpret the power to reject as a license to revoke a tariff that the Commission has already accepted would be contrary to the plain language of the subsection.[6] For this reason, the District of Columbia Circuit has concluded that rejection provisions analogous to § 10762(e) do not extend to tariffs that have gone into effect. In a case involving the former Federal Power Commission's rejection authority, Judge Leventhal likened rejection to "a motion to dismiss on the face of the pleading," and declared rejection to be "'a peremptory form of response to filed tariffs.'" *Municipal Light Boards* v. *FPC*, 146 U. S. App. D. C. 294, 299, 450 F. 2d 1341, 1346 (1971) (quoting F. Welch, Cases and Text on Public Utility Regulation 581 (1961)), cert. denied, 405 U. S. 989 (1972). In a subsequent case dealing with the former Civil Aeronautics Board's rejection authority, another appellate panel approved of Judge Leventhal's analysis and concluded: "[R]ejection is a regulatory device properly used only *prior* to a tariff's effective date." *Delta Air Lines, Inc.* v. *CAB*, 177 U. S. App. D. C. 100, 121, 543 F. 2d 247, 268 (1976) (emphasis in original).

A further reason to believe that § 10762(e) does not extend to effective tariffs is the difference between the procedural safeguards incorporated into § 10762(e) and those that Congress built into remedies clearly designed to reach effective tariffs. On its face and as applied by the Commission, § 10762(e) offers affected carriers no

---

[6] Section 10762(e)'s placement within the ICA lends credence to the view that rejection is a summary power to be used at the outset of the rate-filing process. Section 10762(e) appears in a section regulating the manner in which new tariffs are to be filed with the Commission prior to their effective date. By authorizing the Commission to "reject a tariff . . . if that tariff violates this section," § 10762(e) seems focused on the Commission's authority to turn away a tariff submission at the time of filing.

opportunity to challenge a decision to reject. Rejection is peremptory, and the carrier's only recourse is to submit a corrected tariff. On the other hand, § 10704(b), which deals with the Commission's authority to cancel effective tariffs and to prescribe new rates for the future, provides that the Commission must conduct a full hearing before taking any action. It would be bizarre, to say the least, to interpret § 10762(e) to give the Commission peremptory authority to void effective rates retroactively, when § 10704(b) places procedural constraints on the Commission's authority to take the less drastic step of modifying effective tariffs prospectively.

Similarly, reading § 10762(e) to give the Commission unbridled discretion to reject effective tariffs at any time would undermine restraints placed by Congress on the Commission's power to suspend a proposed tariff pending investigation. See § 10708; *supra*, at 360. The Commission's power to suspend is limited to the seven months after the proposed tariff's effective date, and final action in a suspension-investigation proceeding can be taken only after a full hearing. §§ 10708(a)(2), (b). Were we to read § 10762(e) as broadly as the Commission proposes, the temporal and procedural constraints of § 10708 would be nugatory, since the Commission could rely on its rejection powers to void a regulation at any time and without any procedural safeguards.

The language of § 10762(e) is admittedly ambiguous, and, in the ordinary course, we might defer to the Commission's view that the subsection should be given a liberal interpretation. However, in this case, the Commission's interpretation is unsupported by a natural reading of the provision and inconsistent with the remedial structure established by Congress.[7] Under these circumstances, we cannot defer

---

[7] Previous decisions of this Court coupled with past rulings of the Commission cast further doubt on the proposition that § 10762(e) authorizes the Commission to nullify any effective tariff containing either

to the Commission's interpretation, and we accept the view of the Eleventh Circuit that § 10762(e) does not license the Commission to reject effective tariffs.

### B

Although we conclude that § 10762(e) does not bestow on the Commission a general authority to reject effective tariffs, this conclusion does not resolve the dispute. The Commission's authority under the Interstate Commerce

substantive or formal defects. In *Berwind-White Coal Mining Co.* v. *Chicago & Erie R. Co.*, 235 U. S. 371 (1914), and again in *Davis* v. *Portland Seed Co.*, 264 U. S. 403 (1924), we stressed the importance of common carriers' being able to rely on effective tariffs on file with the Commission. As the Commission itself once recognized, these cases "strongly sugges[t] that recovery for a tariff's failure to comply with a formal requirement may be limited to the amount of damage suffered by the shipper." Brief for Federal Respondents in Opposition in *Nitrochem, Inc.* v. *ICC*, O. T. 1981, No. 81–1205, p. 6. Reading § 10762(e) to authorize retroactive rejection of effective tariffs would significantly undermine the repose that carriers have traditionally been permitted to enjoy once their tariffs have been accepted by the Commission.

Indeed, until the recent past, the Commission generally shared the view that, though a tariff might have been submitted in a technically deficient manner, the tariff was not a nullity and a shipper's recovery was limited to actual damages. See *Boren-Stewart Co.* v. *Atchison, T. & S. F. R. Co.*, 196 I. C. C. 120 (1933); see also *Acme Peat Products, Ltd.* v. *Akron, C. & Y. R. Co.*, 277 I. C. C. 641, 644 (1950) ("Where tariffs are tendered to and accepted by the Commission, the rates therein become applicable, even though technically they should have been rejected upon tender"). The few instances in which the Commission has nullified effective tariffs have involved cases of tariffs mistakenly filed with the Commission by carriers outside the Commission's jurisdiction. See *Acme Fast Freight, Inc., et al., Common Carrier Application*, 17 M. C. C. 549 (1939), sustained, 30 F. Supp. 968 (SDNY), aff'd, 309 U. S. 638 (1940) *(per curiam); Mercer Valley R. Co.* v. *Pennsylvania R. Co.*, 69 I. C. C. 233 (1922). Only in 1978 did the Commission propose to nullify an effective tariff of a carrier within the Commission's jurisdiction. *National Assn. of Specialized Carriers, Inc., Agent-Show Cause and Strike Order*, I. C. C. Order No. 36870 (Apr. 11, 1978). While an agency is free to change its mind about the meaning of an enabling Act, that the Commission has so long adhered to a narrow view of its rejection authority has some probative value for our decision today.

Act is not bounded by the powers expressly enumerated in the Act. 49 U. S. C. § 10321(a). As we have held in the past, the Commission also has discretion to take actions that are "'legitimate, reasonable, and direct[ly] adjunct to the Commission's explicit statutory power.'" *Trans Alaska Pipeline Rate Cases*, 436 U. S., at 655 (quoting *United States* v. *Chesapeake & Ohio R. Co.*, 426 U. S. 500, 514 (1976)). We have recognized that the Commission may elaborate upon its express statutory remedies when necessary to achieve specific statutory goals. In this case, the Commission argues that the retroactive rejection of rate-bureau tariffs is simply an adjunct to the Commission's § 10762(e) rejection authority, and that, to the extent that there is an elaboration on that authority, it is necessary to ensure compliance with rate-bureau agreements. In these narrow circumstances, we agree.

The doctrine of ICC discretion arose out of a recognition that, since drafters of complex ratemaking statutes like the ICA neither can nor do "include specific consideration of every evil sought to be corrected," the absence of express remedial authority should not force the Commission "to sit idly by and wink at practices that lead to violations of [ICA] provisions." *American Trucking Associations, Inc.* v. *United States*, 344 U. S. 298, 309–310, 311 (1953). The doctrine originated in cases in which we accorded the Commission latitude to interpret its statutory powers in a reasonable manner. See, *e. g.*, *American Trucking Associations, Inc.* v. *United States, supra;* cf. *Permian Basin Area Rate Cases*, 390 U. S. 747, 774–777 (1968) (comparable construction of the authority of the FPC under the Natural Gas Act). More recently, however, we have applied the doctrine to sustain the Commission's efforts to place reasonable conditions on its acceptance of proposed tariffs. For instance, in *United States* v. *Chesapeake & Ohio R. Co., supra*, we upheld a decision by the Commission to approve tariff increases only on the condition that carriers spend a specific portion of the increase on capital improvements and deferred maintenance. Although

the ICA provides the Commission no express authority to dictate the manner in which carriers expend their revenues, we held that the Commission's conditions of approval were sufficiently tied to the ICA's statutory goal of safeguarding the Nation's transportation system to withstand judicial review.

In *Trans Alaska Pipeline Rate Cases, supra,* this Court again addressed the Commission's discretionary authority to condition tariff approval in a manner reasonably tied to statutory objectives. In that case, the Commission had extracted from pipeline owners, in exchange for approval of a tentative tariff schedule, the owners' promise to refund whatever portion of the tentative rates the Commission subsequently found to be unreasonable. Claiming this action was unauthorized under the ICA, the pipeline owners argued that the Commission was required to choose between either suspending the proposed tariffs for an investigation into their reasonableness or approving the tariffs subject to prospective modification at some future date. Even though we agreed that the Commission lacks explicit authority to order refunds on tariffs that have gone into effect, we declined to interpret the ICA as placing the Commission in the dilemma posited by the pipeline owners. Suspension would have delayed the opening of the Alaska pipeline, whereas unconditional approval of the proposed rates might have unjustly enriched the pipeline owners. Since both alternatives were inconsistent with the policies underlying the ICA, we concluded that the Commission was justified in transcending its explicit remedial authorities and conditioning the approval of the Alaska-pipeline tariffs on a commitment to refund unreasonably high rates.

The remedial authority at issue in this case consists of another effort by the Commission to place a condition on the approval of a proposed tariff. In effect, the Commission has informed all motor carriers submitting proposed tariff

increases that the Commission will approve those increases subject to the condition that the carriers may be called upon to disgorge the increases if the Commission later discovers that the tariffs were submitted in substantial violation of a rate-bureau agreement. This retroactive rejection of tariffs is akin to the remedial authorities that Congress expressly delegated the Commission. A primary responsibility of the Commission is to supervise and approve tariffs submitted under the ICA. Under 49 U. S. C. § 10762(e), the Commission is expressly empowered to reject tariffs prior to their effective date. The Commission's proposal to reject effective tariffs submitted in substantial violation of rate-bureau agreements simply extends the Commission's express rejection authority so that the Commission may adequately supervise motor-carrier rate-bureau agreements. The question presented by this case is whether fashioning this remedy falls within the Commission's authority to modify express remedies in order to achieve legitimate statutory purposes. To lie within the Commission's discretionary power, the proposed remedy must satisfy two criteria: first, the power must further a specific statutory mandate of the Commission, and second, the exercise of power must be directly and closely tied to that mandate.

The Motor Carrier Act of 1980 presents a statutory basis for the Commission to approve motor-carrier tariffs on the condition that the Commission may later nullify increases found to have been submitted in substantial violation of rate-bureau agreements. The legislative history of the Act is clear that, beyond the bounds of immunity granted in § 10706(b)(3), Congress wanted the forces of competition to determine motor-carrier tariffs.[8] The function of the Commission's proposed remedy is to ensure that motor carriers

---

[8] See H. R. Rep. No. 96–1069, pp. 27–28 (1980); 126 Cong. Rec. 7777 (1980) (statement of Sen. Cannon).

collude only as permitted by the MCA guidelines. The conditional approval of motor-carrier tariffs with concomitant threat of overcharge liability provides strong incentives for motor carriers to abide by the terms of their rate-bureau agreements. Since § 10706(b)(3) prescribes the guidelines for rate-bureau agreements, this remedy encourages motor carriers to limit their collective activities to the areas that Congress described in the statutory guidelines.

There can be little doubt that Congress intended for the Commission to play a key role in holding carriers to the § 10706(b)(3) guidelines. Section 10706(b)(3), like the Reed-Bulwinkle Act before it, grants motor carriers immunity from the antitrust laws. To some degree, § 10706(b)(3) is self-enforcing, because bureau members will strive to stay within its guidelines in order to avoid the antitrust liability that transgressions could precipitate. However, the procedures governing the administration of § 10706(b)(3) demonstrate that Congress envisioned that the Commission—and not the threat of antitrust liability—would be the primary enforcer of the guidelines. It is, after all, the Commission that decides which bureau agreements conform to the dictates of § 10706(b)(3). 49 U. S. C. § 10706(b)(2). It is the Commission that is empowered to terminate or suspend rate-bureau agreements. §§ 10706(f), (h). And, it is the Commission that may impose conditions on rate-bureau agreements in order to further National Transportation Policy. § 10706(b)(2).[9]

---

[9] As respondents stress, Congress passed § 10706(b)(3) partially to restrain the Commission from exercising too much discretion in dictating the terms of rate-bureau agreements. See *supra*, at 356–357. However, the limitations on the Commission's power embodied in the MCA are all directed at the Commission's substantive authority to set the criteria for acceptable rate-bureau agreements. No provision of the Act limits the Commission's remedial authority to deal with motor carriers that operate in clear violation of approved agreements. To the contrary, the House Report on the MCA expressly states that the legislation will not diminish the Commission's enforcement authority. See H. R. Rep. No. 96–1069, *supra*, at 40.

More difficult to answer is the question whether the Commission's conditional approval of motor-carrier tariffs is a means of policing rate-bureau agreements sufficiently direct and close to the Commission's statutory mandate to warrant approval. The Commission offers two imbricated justifications for its new remedy. First, the Commission argues that, without the potential for overcharge damages awards, shippers will not have sufficient incentive to report rate-bureau violations to the Commission or to file antitrust suits on their own. Second, the Commission claims that it must have the power to approve bureau tariffs conditionally because the other remedial tools at its disposal are inadequate to enforce compliance with bureau agreements. In the Commission's view, the threshold remedies of peremptory rejection of proposed rates and of suspension of rates pending investigation are inadequate to cope with substantial violations, which are typically shrouded in secrecy and undetectable on the face of a tariff proposal. If a substantial bureau violation comes to light once a tariff is in effect, the Commission's only statutory remedy is to declare the tariff in violation of the ICA and to prescribe a new rate for the future. Admittedly, such a declaration and prescription will render the offending carriers liable for damages actions brought by injured shippers, but the size of the damages awards would, in the Commission's opinion, provide insufficient incentive to keep carriers faithful to their bureau agreements.[10] Similarly, the Commission maintains that its penalty authority is too weak to guarantee compliance with bureau agreements.[11]

But the very potency of overcharge is what makes the nullification of motor-carrier tariffs a troubling exercise of Com-

---

[10] See n. 5, *supra.*

[11] In another field, the inadequacy of an agency's express statutory authority might be seen as evidence that Congress intended for the agency not to possess more adequate powers. However, this inference cannot be drawn in this area because 49 U. S. C. § 10321(a) provides: "Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle."

mission authority. For a motor carrier, overcharge liability may be ruinous. Overcharge awards can easily surpass the damages for which carriers have historically been liable under § 11705(b)(3), and may even exceed the treble damages to which the carriers are vulnerable under the antitrust laws. Indeed, the effect of the Commission's proposed new remedy is to convert the ICC into the Federal Government's most potent enforcer of the antitrust laws, albeit for the limited purpose of ensuring compliance with the guidelines of § 10706(b)(3).[12]

Nevertheless, we agree with the Commission that its new remedy is a justifiable adjunct to its express statutory mandate. The nullification of effective tariffs submitted in violation of rate-bureau agreements is directly aimed at ensuring that motor carriers comply with the guidelines established by Congress in the MCA. Consistent with congressional intent, the remedy stimulates competitive pricing beyond the bounds of the motor-carrier immunity granted in § 10706(b)(3). Moreover, the structure of the MCA and its legislative history establish that Congress expected that the Commission would play a key role in holding carriers to the § 10706(b)(3) guidelines, and it is within the Commission's discretion to decide that the only feasible way to fulfill its mandate is to condition approval of motor-carrier tariffs on compliance with approved rate-bureau agreements.

Our concern over the harshness of this new remedial authority is lessened by the significant steps the Commission has taken to ensure that the penalty will not be imposed unfairly. Under the Commission's proposed scheme, effective tariffs will be nullified only upon findings of substantial violations of rate-bureau agreements. The guidelines for antitrust immunity set out in § 10706(b)(3) are of such a nature

---

[12] Under some circumstances, overcharge liability might exceed the maximum penalty for criminal violations of the antitrust laws, which is $1 million. See 15 U. S. C. § 1 et seq.

that carriers who submit tariffs in substantial violation of agreements will be aware of their transgressions. So concerns that the new remedy will be used to penalize carriers that inadvertently transgress rate-bureau agreements are largely unfounded. Moreover, the risk that the Commission will err in finding substantial violations is lessened by the procedural safeguards of full hearings and judicial review that are built into the Commission's proposal. Finally, the Commission has reserved the discretion to withhold the sanction of retroactive rejection, should the circumstances of a violation counsel lenity.[13]

## III

For the foregoing reasons, we conclude that the Commission does not exceed its authority by nullifying effective motor-carrier tariffs submitted in substantial violation of rate-bureau agreements. Accordingly, the judgment of the Eleventh Circuit is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN, JUSTICE POWELL, and JUSTICE STEVENS join, dissenting.

This case presents the question whether the Interstate Commerce Commission (Commission) may nullify a motor carrier tariff at any time after it has become effective. Such nullification renders the carrier liable to shippers for the amount by which the rejected rate exceeds the last rate the carrier has lawfully filed. The Court quite correctly reasons

---

[13] Although it is difficult to know how the Commission will exercise this discretion, in the only analogous case to date, which happened to involve a railroad rate bureau, the Commission decided that the circumstances of the rate-bureau agreement violation did not warrant rejection. See *Transit on Wheat Between Reshipping Point and Destination*, 365 I. C. C. 890 (1982).

that 49 U. S. C. § 10762(e) does not authorize the Commission to reject effective tariffs. See *ante,* at 361–364. Reading § 10762(e) to authorize such action would indeed give the Commission an "unbridled discretion" that Congress did not intend it to have. See *ante,* at 363. However, after having correctly rejected § 10762(e) as a basis for the proposed rejection power, the Court then mysteriously concludes that the power is within the Commission's "discretionary power" to ensure that shippers adhere strictly to their approved rate bureau agreements. *Ante,* at 367. I frankly do not understand how this alternative "discretionary power" rationale better reins in the Commission's discretion. Accordingly, I dissent.

I

The Court starts with the proposition that the enumeration of certain Commission powers in the Interstate Commerce Act, as amended, 49 U. S. C. § 10101 *et seq.,* does not necessarily exclude others not expressly listed. See *ante,* at 364–365. I have no quarrel with that proposition. Like most agencies, the Commission is authorized to prescribe regulations to carry out its statutory duties. 49 U. S. C. § 10321(a). The Commission's efforts to interpret and implement the tariff filing provisions therefore deserve considerable judicial deference. See *American Trucking Associations, Inc.* v. *United States,* 344 U. S. 298, 311 (1953); see generally *United States* v. *Chesapeake & Ohio R. Co.,* 426 U. S. 500 (1976); *Trans Alaska Pipeline Rate Cases,* 436 U. S. 631 (1978). But this rule of deference has never been equated with a "discretionary power" in the Commission to place conditions on its acceptance of proposed tariffs. I think the Court misreads its prior cases in finding such authority today.

The Court did not, as today's opinion asserts, approve the concept of "discretionary power" of the Commission in *United States* v. *Chesapeake & Ohio R. Co., supra.* In that case, the Commission proposed to allow an immediate rate in-

crease on the condition that the benefited rail carriers devote to certain designated uses the additional revenues earned during the 7-month period the rates would otherwise have been suspended. Though the Commission had no express power to place conditions on the use of these revenues, the Court concluded that qualifying immediate acceptance in this manner was "a legitimate, reasonable, and direct adjunct [of] the Commission's explicit statutory power to suspend rates pending investigation." 426 U. S., at 514. Delaying implementation of the new tariffs would only have frustrated Congress' desire to improve the condition of the railroads. Thus, the Commission's decision to condition its acceptance on use of the moneys earned during the 7-month suspension period was "an alternative tailored far more precisely to the particular circumstances presented." *Ibid.*

Nor did the *Trans Alaska Pipeline Rate Cases, supra,* approve any principle of inherent Commission authority. In these cases, the Commission proposed to allow the owners of the Trans Alaska Pipeline System to implement immediately rates on condition that the carriers refund any amounts collected during the period the rates would otherwise have been suspended and later determined to be unlawful. The Court sustained the Commission's efforts, finding that the condition was a power "'ancillary' to [the] suspension power" and that immediate implementation would further Congress' policy of early development and delivery of oil from Alaska's North Slope. 436 U. S., at 654–655. Again, the Court deferred to the Commission's efforts, but only because the Commission had implemented an alternative that was carefully tied to the statutory suspension power and narrowly tailored to the particular circumstances presented. *Id.,* at 655.

Thus, *Chesapeake & Ohio R. Co.* and *Trans Alaska Pipeline Cases* support neither the remedy the Commission has proposed to implement here nor the power on which the Court suggests that it can be based. In contrast to the conditions imposed in those cases, the Commission's proposed

retroactive rejection power is not a "direct adjunct" of the statutory suspension power. The Commission claims the power retroactively to reject a tariff at *any* time, not just during the 7-month period it could otherwise have suspended and investigated the proposed rates. More importantly, neither case even mentions the principle of "discretionary power" on which the Court today relies. Rather, the Court in both cases gave traditional judicial deference to the Commission's use of its express statutory powers. The idea of a boundless "discretionary power" was simply not considered.

## II

Perhaps recognizing the open-ended character of the regulatory principle it announces, the Court suggests that two limiting criteria will cabin the Commission's discretionary authority. First, the Court proposes that the authority must be exercised to further a specific statutory mandate. *Ante*, at 367. Second, the Court proposes that the exercise of the authority must be directly and closely tied to that mandate. *Ibid.* Whatever the merits of these criteria, they definitely are not satisfied in the circumstances of this case.

## A

The Court points to the Motor Carrier Act of 1980, Pub. L. 96–296, 94 Stat. 793, as the statutory mandate that the Commission's retroactive rejection authority is being used to further. According to the Court, the Congress enacting this legislation left to the Commission discretionary authority to fashion remedial powers necessary to ensure that shippers adhere strictly to their approved rate bureau agreements. *Ante*, at 368. However, an examination of the history behind this legislation unambiguously refutes this view.

Prior to the enactment of the Motor Carrier Act, the Commission had been attempting to curtail drastically the motor carriers' opportunities to engage in collective ratemaking. In one rulemaking proceeding, for example, the Commission had proposed exactly what Congress itself had earlier re-

jected—namely, to apply to motor carrier rate bureaus the severe restrictions on collective ratemaking authority statutorily imposed on rail rate bureaus by the Railroad Revitalization and Regulatory Reform Act of 1976. See 43 Fed. Reg. 1809 (1978). In another instance, the Commission had proposed to review every individual ratemaking agreement to determine if continued approval would be warranted under new Commission standards. See *id.*, at 1666. And in 1979, when budgetary constraints and increased filings caused it to change its tariff monitoring practices, the Commission twice asserted that retroactive tariff rejection was necessary to combat anticompetitive practices in the motor carrier industry. See 44 Fed. Reg. 58511, 58512, 60122, 60123–60124 (1979). The 1980 Congress shared the Commission's desire to increase competition in the motor carrier industry, but it rejected the Commission's attempts to create that competition on its own initiative.

Well aware that the "Commission ha[d] recently embarked upon a series of reviews of rate bureau agreements to determine whether they should be continued and, if so, under what conditions," H. R. Rep. No. 96–1069, p. 27 (1980), Congress made clear that it wanted to *reduce* the Commission's regulatory authority over motor carrier rate bureau practices.

> "[I]n order to reduce the uncertainty felt by the Nation's transportation industry, the . . . Commission [is] given explicit direction for regulation of the motor carrier industry and well-defined parameters within which it may act pursuant to congressional policy; . . . the . . . Commission should not attempt to go beyond the powers vested in it by the Interstate Commerce Act . . . and other legislation enacted by Congress." 94 Stat. 793.

Senator Cannon, one of the sponsors of the 1980 Act, explained:

> "[L]egislation is desperately needed to clarify the existing regulatory uncertainty that plagues the industry and those who care about it. . . . This bill gives specific direc-

tion to the Interstate Commerce Commission and we expect those directions to be followed. Where the Commission is to be given more discretion, it is clear from the statute, but in most cases, the discretion is eliminated." 126 Cong. Rec. 7777 (1980).

Representative Harsha gave a similar explanation to his colleagues in the House:

"For too long Congress has basically been on the sidelines, while the Interstate Commerce Commission exercised unduly wide discretion in regulating the Nation's motor carrier industry. . . . [I]n the past several years, it has made changes in the regulatory system on its own initiative[,] in the absence of congressional guidance, if not consultation.

.   .   .   .   .

"It is not the intent of the committee, and I am certain that it is not the will of Congress, that while we reduce the amount of needless regulation in the trucking industry, we increase the regulatory powers of ICC bureaucrats.

"Therefore, [the bill] give[s] clear guidelines to the ICC on how to administer the law. In so doing, the committee expects the Commission to stay within the explicit powers invested by the new statute. . . ." *Id.*, at 15585.

These sentiments were echoed in the Committee Reports of each congressional chamber. See H. R. Rep. No. 96–1069, *supra*, at 29; S. Rep. No. 96–641, p. 31 (1980).

To be sure, Congress wanted the Commission to "retain and enforce existing regulations as to the processing of loss, damage, and overcharge claims . . . ." H. R. Rep. No. 96–1069, *supra*, at 40. But Congress expressed a strong disapproval of all of the Commission's pre-1980 regulatory innovations, and the retroactive rejection remedy had been prominent among them. See 44 Fed. Reg. 60122, 60123–

60124 (1979); see also *Motor Carrier Rate Bureaus—Implementation of P. L. 96–296*, 364 I. C. C. 464, 503 (1980) (Commissioner Gilliam, concurring); 45 Fed. Reg. 55742 (1980) (Commissioner Stafford, dissenting). Thus, while the 1980 Congress may not have intended to diminish the Commission's existing enforcement authority, there can be no doubt about its intention to prevent the Commission from unilaterally enlarging its own discretionary powers.

### B

The Court contends, nevertheless, that the rejection power is directly and closely tied to 49 U. S. C. § 10762(e). *Ante,* at 369–371. On this view, nullification of effective tariffs is necessary both to ensure that motor carriers comply with the guidelines established by Congress and to stimulate competitive pricing beyond the bounds of the motor-carrier immunity granted in § 10706(b)(3). Though resulting awards could easily surpass the damages for which carriers may be held liable under the antitrust laws, and could therefore convert the Commission into the Federal Government's most potent antitrust enforcer, the Court concludes that deference to the Commission's efforts to enforce § 10706(b)(3), is not inappropriate. *Ante,* at 370–371. I must disagree.

Even if Congress had left the Commission discretion to fashion *some* new remedies to enforce § 10706(b)(3), there is much reason to believe that the retroactive rejection power could not properly be among them. As previously noted, the Commission proposed to use this same retroactive rejection remedy for similar purposes prior to the 1980 legislation. See *supra,* at 375. The Commission was concerned, because of budgetary constraints and increased tariff filings, that it could not catch all improper tariffs and that carriers would have incentives to exceed their limited immunity from the antitrust laws. *Ibid.* The 1980 Congress was well aware of the Commission's concerns and of the remedies the Commission then had available to it. Yet Congress did not include

the rejection power in its comprehensive restructuring of the rate bureau regulatory system. Rather, it emphasized that it did not want to increase the power of the Commission. Perhaps the Commission is correct in asserting that shippers lack sufficient incentives to ensure optimal enforcement of the antitrust laws. But that is a gap Congress obviously wanted the Department of Justice, not the Commission, to fill. See 364 I. C. C., at 503 (Commissioner Gilliam, concurring); 46 Fed. Reg. 2295 (1981) (Commissioner Clapp, concurring). Making the Commission the most potent enforcer of the Nation's antitrust laws is hardly compatible with the congressional antagonism toward the Commission's specific pre-1980 deregulation initiatives.

Indeed, it is easy to see why Congress would not have included a retroactive rejection power among the arsenal of powers available to the Commission. Part of the Motor Carrier Act's purpose was, as the Commission asserts, to limit the rate bureaus' freedom to engage in collusive behavior. Conversely, however, the 1980 Act was equally intended to promote certainty in industry pricing and to protect carriers' reliance on filed tariffs. In the motor carrier industry, goods are shipped, revenues collected, and business plans formulated in reliance on these tariffs. In 1980, Congress apparently continued to believe that effective national transportation policy requires that carriers be able to rely on their filed rates and know that liability for charging those rates will result only if shippers show actual damage. Congress has deliberately encouraged carriers, within limits, to set prices collectively, and has insulated them from the proscriptions of the antitrust laws when they do so. The rejection power, by contrast, confronts carriers with a large and uncertain liability and discourages the collective price setting clearly contemplated by the Act. The rejection power "create[s] a legalized, but endless, chain of departures from [filed] tariff[s]; . . . destroy[s] the equality and certainty of rates, and, contrary to the statute, . . . make[s] the carrier liable for

damages beyond those inflicted and to persons not injured." *Davis* v. *Portland Seed Co.*, 264 U. S. 403, 421 (1924). The power is, therefore, incompatible with collective aspects of the rate-setting scheme Congress intended to promote.

## III

What the Commission really seeks is a remedy that is not statutorily authorized but that is alleged to be administratively needed. The need, of course, is far from clear, given the impressive array of prescriptive powers, overcharge assessments, damages remedies, and civil and criminal fines at the Commission's disposal. See 49 U. S. C. §§ 11705(b) (1)–(3), 10704, 11901(b), 11914(b). If the Commission believes that it needs additional remedial power to enforce the rate bureau provisions, it should seek such power from Congress. But this Court is no more authorized than is the Commission to rewrite the law. Since that is what today's decision allows the Commission to do, I respectfully dissent.