**BAKER PERKINS, INC.,**
**Plaintiff–Appellee,**

v.

**MIDLAND MOVING AND STORAGE COMPANY and United Van Lines, Inc., Defendants–Appellants.**

**No. 89–2254.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 21, 1990.
Decided Dec. 17, 1990.

James H. Mathieu (argued), Sinclair, Mathieu & Lee, Midland, Mich., for plaintiff-appellee.

Edward V. Keelean (argued), Joselyn & Keelean, Detroit, Mich., for defendants-appellants.

Before KRUPANSKY and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

The Interstate Commerce Act of 1887, as amended in 1906 by the Carmack Amendment, requires common carriers to issue bills of lading for property received for transportation. 49 U.S.C. § 11707(a)(1). The current form of the legislation also permits the ICC to authorize a carrier to set rates under which the carrier's liability for damage to such property is limited to a value established by a "written agreement." 49 U.S.C. § 10730(a).

The case at bar involves both a written agreement entered into under the latter section and bills of lading issued under the former section. In the written agreement, defendant United Van Lines, Inc., promised plaintiff Baker Perkins, Inc., that the carrier's liability for damage would be based on the "full value" of goods shipped under the agreement, up to a specified maximum. A tariff provision incorporated in the agreement said that subject to this limit, the carrier would "be liable to the shipper[ ] to make whole those articles lost, destroyed or damaged while in the carrier's custody...."

Neither the tariff provision nor the written agreement made any exception for loss or damage caused by Acts of God. Parol evidence confirmed that no exception was contemplated. Bills of lading issued by a United Van Lines agent to Baker Perkins employees whose household goods were being moved pursuant to the agreement did contain an Act of God exception, however, as did a separate tariff under which the bills of lading were issued.

The employees' goods were damaged by an Act of God while in the custody of the United agent. A district court jury found the defendant carriers liable to plaintiff Baker Perkins for the property's full value. Because we conclude that federal law permitted a finding that the carriers had contracted to pay Baker Perkins for the damage regardless of what caused it, we shall affirm the judgment entered on the jury's verdict.

## I

In June of 1986 representatives of plaintiff Baker Perkins solicited competitive proposals from several motor carriers for moving the household goods of Baker Perkins employees who were being transferred. In response to this solicitation, defendant United Van Lines sent Baker Perkins a proposed "Transportation Agreement," signed by the president of United, stating that "[f]or one Dollar ($1.00) and other valuable consideration" paid by Baker Perkins, United would "perform the transportation services in accordance with its normal operating procedures and in compliance with provisions of Appendix 'A' attached."

At issue here is Item XII of Appendix "A" of the Transportation Agreement. Item XII read as follows:

"On 1st Proviso shipments [*i.e.*, shipments of loose-loaded household goods], carrier shall provide, at no charge to shipper, 'Gold Umbrella Protection' subject to the provisions of Item 1303, exceptions Tariff 104–B and amendments and supplements thereto with a released value to a minimum of $3.50 per pound times the actual weight of the shipment subject to a maximum of $50,000.00 per shipment.

NOTE: Valuation based upon a released factor of $3.50 in excess of $50,000 will be charged at a rate of 40 [cents] per $100.00 valuation purchased."

Not being sure of the meaning of "Gold Umbrella Protection" or Item 1303 of Exceptions Tariff 104–B, a Baker Perkins representative named Donna Stilson telephoned United's agent, defendant Midland Moving and Storage Company, to obtain clarification. Ms. Stilson subsequently testified that she asked if the "insurance protection" covered everything, or if there were any exceptions. The response, she testified, was that "there wasn't anything that wasn't covered."

Ms. Stilson then sent Midland Moving a letter confirming the telephone conversation. The letter, dated August 14, 1986, said this:

"I would like to confirm my understanding of Item XII of Appendix A, per our phone discussion this a.m. You stated this provision gives us $50,000 worth of insurance on all our shipments at no cost to Baker Perkins, but should our employee or Baker Perkins feel the need for more then [sic] the $50,000 it could be purchased at a cost of $4.00 per thousand dollars of increased coverage. If this is incorrect on my part, please let me know right away."

Midland Moving received the letter and did nothing to indicate that this understanding was incorrect. Satisfied with the explanation it had received, Baker Perkins mailed a fully executed copy of the Transportation Agreement to Midland Moving. The Transportation Agreement had been signed by Baker Perkins under date of August 8, 1986, but it was not mailed back to Midland Moving until after the August 14 telephone conversation.

Ms. Stilson never attempted to obtain a copy of Item 1303 of the Exceptions Tariff referred to in the Transportation Agreement. If she had requested this tariff item, she would have received a two-page ICC filing the text of which begins as follows:

"When a shipper orders FULL VALUE PROTECTION in writing, the carrier shall be liable to the shipper, to make whole those articles lost, destroyed or damaged while in the carrier's custody...."

Item 1303 goes on to provide for alternative methods of discharging the liability so assumed; for the selection of declared values based on weight; and for optional "deductibles" of up to $500 per claim. There is then a series of "notes," only one of which—Note 6—has any potential relevance here. Note 6 says that "[t]his Full Value Protection is not insurance," but is, rather, "a liability limitation service as provided for within the Interstate Commerce Act." Unless Note 6 can be read as a disclaimer of liability for damage caused by Act of God, there is nothing in Item 1303 of Exceptions Tariff 104–B to suggest that the carrier's express assumption of liability for articles damaged "while in the carrier's

custody" does not include liability for damage caused other than by the carrier.

In addition to committing the carrier to furnish "Full Value" or "Gold Umbrella Protection" under Exceptions Tariff 104–B, the Transportation Agreement provided for a 35 percent discount off the charges published in specified sections of a different tariff. "Charges in Household Goods Carriers' Bureau Tariff 400–D, Sections 2, 3, 4, 5, 6 & 7 on file with the Interstate Commerce Commission," the Transportation Agreement said, "will be discounted thirty-five percent (35%)...." The entire Transportation Agreement was subject to the proviso that all shipments be booked with agents of United and be invoiced to Baker Perkins.

Sections 2 through 7 of Household Goods Carriers' Bureau Tariff 400–D—the sections establishing the charges to which the agreed discount would apply—are not included in the record before us. The record does, however, contain selected items from Section 1 of this tariff. (Section 1, which purports to establish rules and regulations governing all other sections "unless otherwise provided within individual sections," was not expressly referred to anywhere in the Transportation Agreement.) Section 1 says, among other things, that when property is transferred subject to the provisions of Tariff 400–D, the acceptance and use of a Uniform Household Goods Bill of Lading is required; that the cost of insurance for the benefit of the shipper will not be assumed by the carrier; and that "[t]he carrier shall be liable for physical loss of or damage to any articles from external cause while being carried or held in storage-in-transit EXCEPT loss, damage or delay caused by or resulting ... [f]rom Acts of God." It does not appear that these provisions in Section 1 of Tariff 400–D were furnished to Baker Perkins or called to its attention in any other way.

Among the Baker Perkins employees being transferred in the summer of 1986 were Messrs. Harold Brown and Craig Pollock. Shipments of the household goods of these employees were booked through Midland Moving after Baker Perkins had received the Transportation Agreement but before the company had actually signed the agreement and mailed it back.

On August 13, 1986—a day before the telephone conversation in which Baker Perkins sought to clarify the scope of the "Gold Umbrella Protection" it expected to obtain—Harold Brown's household goods were loaded into a Midland Moving truck. Craig Pollock's goods were not loaded until September 8, 1986, which was after the signed Transportation Agreement had been returned to Midland Moving.

At the time of pickup, neither Brown nor Pollock had seen the Transportation Agreement. Both men, however, had urged Ms. Stilson and her boss to make sure the goods were adequately insured, and we gather they knew of the $50,000 provision. The trial testimony indicated, moreover, that Baker Perkins had not authorized either man to change any agreement Baker Perkins might have with United.

As required by statute, Midland Moving issued a bill of lading for each shipment. The bills of lading were issued not to Baker Perkins, which the Transportation Agreement designated as the "shipper," but to Messrs. Brown and Pollock individually.

Mr. Brown's wife signed his bill of lading at the time of loading, after glancing over both sides of the document and noting that the printed material on the back included an exclusion for Acts of God. (The language of the Act of God exclusion in the bill of lading tracked the corresponding language in Section 1 of Tariff 400–D.) Mr. Brown testified that he did not recall reviewing the bill of lading himself, and he said that his wife had not been authorized to make any changes in Baker Perkins' agreement with United.

Mr. Pollock apparently signed his bill of lading without reading it and without asking for time to go over it. He too was asked to sign at the time of loading. His bill of lading contained an Act of God exclusion identical to that in the bill of lading issued to Mr. Brown.

Both shipments were taken to a Midland Moving warehouse after pickup. On September 12, 1986, while the goods were in

storage there, the warehouse was flooded. It has now been stipulated that the resultant damage to the Brown/Pollock household goods was caused by an Act of God.

## II

Baker Perkins—joined initially by Brown and Pollock—sued United Van Lines and Midland Moving for negligence and breach of contract. The action was filed in a state court in Michigan, but the defendants removed it to federal court under 28 U.S.C. §§ 1441 *et seq.* The removal petition asserted that because the case arose under the Carmack Amendment and the matter in controversy exceeded $10,000, federal jurisdiction existed under 28 U.S.C. § 1337. The plaintiffs did not contest the removal.

The claims of Brown and Pollock were eventually assigned to Baker Perkins. By stipulation, Brown and Pollock were then dropped as parties, and the case went forward with Baker Perkins as the only plaintiff.

Shortly before the start of trial, the district court, ruling on a motion *in limine* filed by the defendants, held that the plaintiff could attempt to show that the defendants had contracted to assume a liability greater than that provided for in the bills of lading; that the plaintiff could introduce evidence outside the contract to explain what "Gold Umbrella Protection" meant; and that damage caused by an Act of God was not necessarily non-compensable. Baker Perkins abandoned its claim that the defendants had been negligent prior to the flood, and the court later held as a matter of law that there had been no showing of negligence after the flood.

The case was tried to a jury of eight. The jury was permitted to hear Baker Perkins' extrinsic evidence on the Gold Umbrella Protection. The defendants moved for a directed verdict at the close of all the evidence, arguing that the bills of lading expressly excluded liability for Acts of God. The district court overruled the motion, observing that "there is another agreement, and that is the Transportation Agreement." The court held that whether the defendants had agreed to assume a liability beyond that prescribed by the bills of lading was a question of fact that would have to be decided by the jury.

By unanimous vote, the jury decided the question in favor of Baker Perkins and assessed damages totalling $83,004. The defendants moved for judgment *n.o.v.* or, in the alternative, for a new trial. The motion was denied, and this appeal followed.

## III

Under the parol evidence rule as traditionally applied, extrinsic evidence is inadmissible to interpret, vary or add to the terms of an unambiguous written instrument. *Trident Center v. Connecticut General Life Insurance Co.*, 847 F.2d 564, 568 (9th Cir.1988). Transportation documents such as bills of lading are, of course, subject to the parol evidence rule. See *Hopper Furs, Inc. v. Emery Air Freight Corp.*, 749 F.2d 1261 (8th Cir.1984). There was nothing ambiguous about the bills of lading issued to Messrs. Brown and Pollock, and the defendant carriers argue that the district court therefore erred in admitting evidence to contradict the Act of God provisions in the bills of lading.

We agree that the evidence in question would not have been admissible to show that Brown and Pollock were entitled to recover under the bills of lading. But the issue before the district court was not whether Brown and Pollock could recover on their bills of lading, but whether Baker Perkins could recover on its Transportation Agreement. The Baker Perkins Transportation Agreement, as we read the record, had an existence separate and apart from the bills of lading issued to Brown and Pollock.

The fully executed Transportation Agreement was not simply an invitation to negotiate, nor was it an offer subsequently subsumed by the bills of lading issued to the Baker Perkins employees. By its own terms, the Transportation Agreement was a separate contract, entered into by separate parties, supported by a separate consideration, and imposing separate responsi-

bilities for loss, destruction, or damage occurring while the goods were in the carrier's custody. The contract provided, in essence, that if movements of household goods of Baker Perkins employees were booked through a United Van Lines agent and invoiced to Baker Perkins, the company would receive a 35 percent discount and would be provided "Gold Umbrella Protection" in accordance with Item 1303 of Exceptions Tariff 104–B. If "Gold Umbrella Protection" gave Baker Perkins something more than the employees were entitled to receive under their bills of lading, we see no reason why Baker Perkins should not be entitled to receive the benefit of its bargain.[1]

■ The law that governs the validity and effect of the Transportation Agreement is federal law. See *Adams Express Co. v. Croninger,* 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913), and *W.D. Lawson & Co. v. Penn Central Co.,* 456 F.2d 419 (6th Cir.1972). We know of nothing in the federal law that would prohibit a carrier from filing a tariff providing for full value protection that would exclude consequential damages (damages such as those sought in *Paulson v. Greyhound Lines, Inc.,* 804 F.2d 506 (8th Cir.1986), *e.g.*), but would cover all physical damage occurring while goods were in the carrier's custody. 49 U.S.C. § 10730(a), as we have seen, expressly authorizes the execution of written agreements spelling out the limits of the carriers' liability, and that is what the Transportation Agreement, by incorporating Item 1303 of Exceptions Tariff 104–B, appears to have done.

The legislative history of the Motor Carrier Act of 1980 makes it clear that Congress wanted the forces of competition to determine motor carrier tariffs. See *ICC v. American Trucking Assns., Inc.,* 467 U.S. 354, 367, 104 S.Ct. 2458, 2466 n. 8, 81 L.Ed.2d 282 (1984). It would hardly be surprising, therefore, to find that competition has spurred motor carriers to offer lower rates and/or more protection than they did prior to 1980. Corporate customers now routinely enter into Transportation Agreements like Baker Perkins', the President of Midland Moving explained at trial; "since the moving industry has been deregulated," he added, "the old days of working directly out of a tariff book and everybody's rates are the same, are different."

■ But what did the Gold Umbrella or Full Value Protection promised in Item XII of Baker Perkins' Transportation Agreement actually mean? Although the tariff provision incorporated in Item XII does not appear to carve out any exceptions (other than optional "deductibles") to the carrier's obligation to make good on all articles "damaged while in the carriers' custody," Note 6 of the tariff provision does say that the protection "is not insurance."

By itself, this disclaimer of insurance protection is not very informative. Even the President of Midland Moving, during unguarded moments in his testimony, referred to Gold Umbrella Protection as "insurance,"[2] and insurance that covers negligence only is still "insurance," in common parlance, just as it is when all risks are covered. Historically, however, carriers often disclaimed liability for damage caused by Acts of God, and the liability imposed by the Carmack Amendment extends only to loss or injury caused by the carrier. 49 U.S.C. § 11707(a)(1). Item 1303 of Exceptions Tariff 104–B does not say that the carrier shall be liable for damage to goods in the carrier's custody only where the damage is caused by the carrier, but some such limitation might be considered implicit in the statement that "Full Value Protection is not insurance."

---

1. Because the Transportation Agreement represented a separate contract with Baker Perkins, we attach no significance to the circumstance that Mrs. Brown signed one of the bills of lading before the Transportation Agreement was finalized while Mr. Pollock signed the other bill of lading after the Transportation Agreement was finalized.

2. When Marine Midland's lawyer asked him why he kept using the word "insurance" instead of "valuation," the witness explained that "in the moving industry, we plug [these terms] in and out, and that's a problem with the industry."

But if Note 6 of the Exceptions Tariff was intended as an exclusion of liability for damage caused by Acts of God, the exclusion is far from a model of clarity. Parol evidence is always admissible to clarify an ambiguous document, and insofar as the Transportation Agreement incorporated Item 1303 of Exceptions Tariff 104–B, the agreement was simply not worded with the sort of precision that would preclude clarification by evidence *aliunde* the agreement itself.

The Transportation Agreement also made reference to Tariff 400–D, to be sure, and Section 1 of Tariff 400–D does contain an unambiguous exclusion of liability for Acts of God. Unfortunately for the defendant carriers, however, there was no reference to Tariff 400–D in the section of the Transportation Agreement (Item XII) that dealt with Gold Umbrella Protection. Moreover, the sections of Tariff 400–D that prescribe the charges from which the Transportation Agreement said Baker Perkins would receive a discount do not, as far as we know, deal with liability for Acts of God. If Item XII of the Transportation Agreement was intended to incorporate Section 1 of Tariff 400–D, which contains the Act of God provision, the intent, again, was not expressed with a degree of clarity sufficient to justify the exclusion of parol evidence showing what the parties really agreed to.

■ It is true, as the defendant carriers argue, that shippers are charged with notice of applicable tariff provisions. *American Ry Express Co. v. Daniel*, 269 U.S. 40, 46 S.Ct. 15, 70 L.Ed. 154 (1925); *Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619 (7th Cir.1979). But where a carrier is attempting to limit its liability for full actual damages, the caselaw is clear that the carrier must show more than an appropriate tariff schedule; the carrier must show, among other things, that liability was limited by a written *agreement*. *Anton v. Greyhound Van Lines, Inc.*, 591 F.2d 103, 107–08 (1st Cir.1978); *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415–17 (7th Cir.1987), *cert. denied*, 485 U.S. 913, 108 S.Ct. 1068, 99 L.Ed.2d 248 (1988). *Cf.*

*Underwriters at Lloyds of London v. North American Van Lines*, 890 F.2d 1112 (10th Cir.1989) (Carmack Amendment held to preempt state law negligence claim for carrier's loss of goods shipped under lawful bill of lading containing liability limitation for which the shipper had "knowledgeably bargained.")

■ In signing bills of lading that said the carrier would not be liable for loss or damage resulting from Acts of God, Mrs. Brown and Mr. Pollock executed precisely the sort of written agreement that would have been necessary to make the tariff's liability limitation effective as to them. But Baker Perkins—the company that was paying the carrier's bill—signed no such agreement. Baker Perkins never knowledgeably bargained to forego claims for damage caused by Acts of God. Neither Mrs. Brown nor Mr. Pollock was purporting to act on behalf of Baker Perkins in signing the bills of lading, as far as the record discloses, and neither individual was authorized to renegotiate the Transportation Agreement. Although the Transportation Agreement said that services would be provided in accordance with United Van Lines' "normal operating procedures," which would necessarily entail the issuance of bills of lading, there was no showing that Baker Perkins knew that the owners of the household goods would be asked to sign bills of lading directly contradicting the terms of the Transportation Agreement. Although the defendants might well have had a tariff defense against Brown and Pollock, therefore, we do not believe that they established such a defense against Baker Perkins.

■ If, as we hold, parol evidence was admissible to show what the Transportation Agreement actually meant, the jury was obviously entitled to accept as true Ms. Stilson's testimony that Midland Moving told her "there wasn't anything that wasn't covered" by the Gold Umbrella "insurance" protection. Judge Gadola was therefore right in submitting the case to the jury, we believe, just as he was right in declining to enter judgment for the defendant carriers notwithstanding the verdict for plaintiff

**1308**

Baker Perkins. Judgment *n.o.v.* is only proper where the judge concludes, without weighing the credibility of the witnesses and while viewing the evidence in the light most favorable to the opponent of the motion, that no reasonable person could find in favor of the opponent and that the moving party is entitled to judgment as a matter of law. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104–05 (6th Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). That is not this case. There was no abuse of discretion in declining to grant the defendants a new trial, finally, and the denial of a motion for a new trial may not be reversed on appeal except upon a showing of abuse of discretion. *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989).

Accordingly, the judgment of the district court is AFFIRMED.