NATIONAL CLASSIFICATION COM-
MITTEE and National Motor Freight
Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

NATIONAL CLASSIFICATION COM-
MITTEE and National Motor Freight
Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

Nos. 84–1195, 84–1329.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 18, 1985.

Decided June 14, 1985.

As Amended June 25, 1985.

Wald, Circuit Judge, filed a separate
statement.

John R. Bagileo, Washington, D.C., with
whom William W. Pugh, Bryce Rea, Jr. and
Leo C. Franey, Washington, D.C., were on
the brief, for petitioners.

Craig Keats, Atty., I.C.C., Washington,
D.C., with whom J. Paul McGrath, Asst.
Atty. Gen., Robert S. Burk, Acting General
Counsel, Lawrence H. Richmond, Deputy
Associate General Counsel, Evelyn G. Ki-
tay, Atty., I.C.C., Robert B. Nicholson and
Robert J. Wiggers, Attys., Dept. of Justice,
Washington, D.C., were on the brief, for
respondents.

Before WALD, EDWARDS and DAVIS*,
Circuit Judges.

Opinion for the Court filed by Circuit
Judge WALD.

Separate Statement filed by Circuit
Judge WALD.

WALD, Circuit Judge:

Petitioners, the National Classification
Committee ("NCC") and the National Mo-
tor Freight Traffic Association, Inc.
("NMFTA"), seek review of two Interstate
Commerce Commission ("ICC" or "Com-
mission") decisions ordering petitioners to
cancel tariffs reclassifying certain commod-
ities. These cancellations were predicated
upon a prior Commission decision cancel-
ling two other reclassification tariffs of
petitioners because their reclassification
procedures violated the Motor Carrier Act
of 1980 ("the MCA"). Petitioners appealed
that decision to this court, claiming that
their procedures conformed with the rele-
vant provisions of the MCA and that the
Commission had exceeded its statutory au-
thority in cancelling the tariffs. This court

---

* Of the United States Court of Appeals for the
Federal Circuit, sitting by designation pursuant

to 28 U.S.C. § 291(a).

rejected petitioners' challenge and affirmed the Commission's decision. We find that our affirmance of the Commission's initial decision collaterally estops petitioners from relitigating the validity of the Commission's determination that the reclassification procedures at issue violate the MCA.

## I. BACKGROUND

The Reed-Bulwinkle Act of 1948, ch. 491, § 1, 62 Stat. 472 (current version at 49 U.S.C. § 10706(b)), granted motor carriers, subject to the Commission's jurisdiction, antitrust immunity to form rate bureaus and submit collectively determined rates and classifications to the Commission. Such rate bureaus must, however, obtain prior Commission approval of rate bureau agreements setting forth the procedures by which the bureau will determine the collective tariffs. In 1956, the Commission approved an agreement submitted by NMFTA providing procedures for the collective determination of motor freight classifications by the NCC—a committee of one hundred representatives of the motor carriers party to the NMFTA agreement.[1] *See National Classification Comm. Agreement*, 299 I.C.C. 519 (1956). In 1980, however, Congress enacted the MCA, Pub.L. No. 96–296, 94 Stat. 793, in an effort both to reform the rate bureau process and to limit the Commission's discretion to approve or disapprove rate bureau agreements. *See* H.R.Rep. No. 1069, 96th Cong., 2d Sess. 27–30 (1980), U.S.Code Cong. & Admin.News 1980, 2283. Section 14 of the MCA, 49 U.S.C. § 10706(b)(2), (3), established specific guidelines to which rate bu-

reau agreements must conform. The enactment of the MCA necessitated the submission of new rate bureau agreements if the provisions of a rate bureau's existing agreement did not comply with the requirements of section 14. Petitioners filed their amended agreement with the Commission on May 26, 1981. *See National Classification Committee Agreement*, as amended May 26, 1981, Joint Appendix ("J.A.") at 153. At the time of this appeal, the Commission had not acted to approve or disapprove the procedures authorized by petitioner's amended agreement. The Commission has, however, disapproved certain procedures apparently authorized by petitioners' agreement in specific proceedings ordering the cancellation of tariff items published pursuant to those procedures.

The provisions of section 14 of the MCA were intended in part to reform the rate bureau process by specifically limiting the functions to be performed by rate bureau employees, thereby assuring that the member carriers, rather than the employees, would play the decisive role in determining collective rates or classifications.[2] Under the petitioners' 1956 agreement, the National Classification Board ("NCB"), an employee committee comprised of classification experts, formally docketed classification proposals and determined initial dispositions on all docketed proposals. Those dispositions became final absent an appeal to the NCC. These procedures were amended by petitioners in their new agreement submitted to comply with the conditions of section 14. Petitioners' amended

---

**1.** NMFTA functions like a rate bureau; however, rather than determining collective rates, NMFTA determines collective freight classifications. Freight classifications are groupings of commodities having equivalent transportation characteristics, *e.g.,* shipping weight, ease of handling, stowability, density, liability. Such classifications are incorporated into "class rate" tariffs published by regional rate bureaus and individual carriers. A class rate tariff is the rate charged to transport commodities of a given class.

**2.** Congress expressed concern about the closed door nature of rate bureau proceedings and the fact that rate bureau employees appeared effec-

tively to control the process. The House Report states:

> Another serious problem has been the closed door nature of rate bureau proceedings. Voting upon specific rate proposals is done behind closed doors. In addition, many have contended that the entire process is controlled by rate bureau employees rather than by the carriers themselves.

H.R.Rep. No. 1069, 96th Cong., 2d Sess. 27 (1980), U.S.Code Cong. & Admin.News 1980, 2309. The term rate bureau employee ("employee") as used in this opinion refers to the non-carrier employees of the bureau.

agreement delegates to the National Classification Review Subcommittee ("NCRC"), a subcommittee of the NCC consisting of 27 carrier members, the carrier's responsibility for voting on whether to docket a proposal and subsequently on whether to approve, disapprove, or modify a docketed proposal. The NCB is still permitted to initiate reclassification proposals, to recommend that a proposal be docketed, and to analyze and make recommendations on the final disposition of proposals. If the NCRC votes to docket a proposal initiated by the NCB, then the NCC is designated as the proponent of the proposal.

In *Reclassification of Pork Skins and Bacon Rinds, NMFC, August 1982,* No. M–30360 (1983) (*"Pork Skins"*), *reprinted in* Brief for Respondents, Addendum B, the Commission cancelled NCC tariff items reclassifying pork skins and bacon rinds because it found that the amended classification procedures used still violated the statutory provisions of the MCA. Specifically, the Commission concluded that the employee initiation of proposals by the NCB, which are then docketed by a vote of the NCRC, violates the employee docketing ban in 49 U.S.C. § 10706(b)(3)(B)(iv) and that the listing of the NCC as the proponent of such proposals violates the requirement for disclosure of a classification proponent's identity in 49 U.S.C. § 10706(b)(3)(B)(v). The pertinent statutory provisions provide:

(B) Any organization established or continued under an agreement approved under this subsection must comply with the following requirements:

. . . .

(iv) the organization may not permit one of its employees or any employee committee to docket or act upon any proposal affecting a change in any tariff item published by or for the account of any of its member carriers;

(v) upon request, the organization must divulge to any person the name of the proponent of a rule or rate docketed with it, ... and must divulge to any person the vote cast by any member carrier on any proposal before the organization.

49 U.S.C. § 10706(b)(3)(B)(iv), (v). The Commission determined that these provisions of the MCA were intended to require "that carriers or shippers, not rate bureau employees, initiate classification proposals" and that the specific carrier or shipper initiating the proposal must be identified as the proponent of the proposal. *Pork Skins* at 5. The Commission reasoned as follows:

In reforming motor carrier rate bureau procedures, Congress intended to lift the veil of secrecy that has obscured rate-making for over 30 years. It sought, among other things, to place the open responsibility for rate and classification changes on individual carriers. The actions of the NCC as the nominal initiator of a majority of classification changes obstruct this goal. By proposing classification changes as a group, NCC members take only collective responsibility for the changes and thereby avoid the competitive consequences of individual carrier responsibility. This is directly contrary to congressional intent. Thus, even though the NCC is composed of member carriers, it may not docket proposals in its own name. Only the actual proponent carrier may properly request consideration of a change in the tariff.

Since the docketing of the pork skins reclassification by the NCC was inconsistent with the employee docketing ban in 49 U.S.C. 10706(b)(3)(B)(iv) and with the requirement of 49 U.S.C. 10706(b)(3)(B)(v) for disclosure of a proponent's identity, the tariff filing that incorporates this reclassification is unlawful.

*Id.* at 5–6.

After concluding in the first part of the opinion that the procedures used to docket the proposal violated the MCA, the Commission then went on in part two of the opinion to find that certain procedures used in the disposition of the proposal so docketed further violated the intent of the MCA by encouraging the rubber stamp approval by the NCC of employee initiated and recommended proposals. *See id.* at 6–8 ("Disposition of the Docketed Proposal"). First,

the Commission found that the NCC's approval of the pork skins proposal was based entirely on the recommendation of the NCB with no indication that the member carriers exercised any independent judgment. The Commission concluded that this procedure was inconsistent with the implementing requirements for the MCA set forth by the Commission. *Id.* at 7 (citing *Motor Carrier Rate Bureaus—Implementation of P.L. 96–296*, Ex Parte No. 297 (Sub-No. 5), 364 I.C.C. 464 (1980)).[3] Second, the Commission found that the NCB's conducting of a hearing on the proposal was "contrary to the spirit of the statutory prohibition of employee docketing, because ... the rule against employee docketing was designed to assure that carriers propose their own rates and make their own decisions." *Id.* The Commission reasoned that "[i]f rate bureau employees should not initiate or submit rate proposals nor make final determinations to dispose of them, it follows that employees also should not be the ones to take testimony and hear evidence on the merits of proposals." *Id.* Finally, the Commission found that, while mail voting is not ordinarily considered a violation of the MCA's open meeting provision, *see* 49 U.S.C. § 10706(b)(3)(B)(v), NCC's use of mail voting in conjunction with the other procedures used did violate the Act. Specifically the Commission stated:

> When used in conjunction with the NCC's current procedures, mail voting enhances the influence of the bureau employees and encourages a passive (i.e., "rubber stamp") role by committee members. For that reason, we conclude that mail voting on the pork skin reclassification proposal was an integral part of an overall procedure that violated the principle of specific carrier responsibility for tariff proposals.

*Pork Skins* at 8.

The petitioners appealed the Commission's *Pork Skins* decision, arguing that

**3.** The Commission has been somewhat equivocal about the circumstances under which employee recommendations are permissible. Although there is language in *Pork Skins* which may be read to indicate that employee recommendations are *per se* unlawful, we note that neither the MCA nor the Commission's implementing requirements explicitly bar employee recommendations *per se*. To the contrary, the legislative history of the MCA expressly indicates that Congress recognized the value of employee recommendations and did not intend to bar completely such recommendations. The Senate Committee explicitly rejected an amendment which would have prohibited employee recommendations stating:

> In particular, the Committee eliminated a strict prohibition against employees of rate bureaus making recommendations with regard to changes in tariff items. The Committee strongly believes that rate bureau employees should play less of a part in determining carrier rates than the carriers themselves. Nevertheless, it is clear that these individuals have a good deal of expertise and that their recommendations are valuable to the member carriers. Accordingly, that specific prohibition has been eliminated.

S.Rep. No. 641, 96th Cong., 2d Sess. 14 (1980); *see also* H.R.Rep. No. 1069, 96th Cong., 2d Sess. 27 (1980), U.S.Code Cong. & Admin.News 1980, 2309. ("Many ... rate bureaus are staffed by skilled rate experts with technical expertise ... to make recommendations...."). Thus we conclude that the Commission's finding that the NCB recommendation was impermissible in *Pork Skins* and this court's affirmance of that finding should be limited to the context in which the recommendation occurred, *i.e.*, in conjunction with employee initiation of the proposal and collective docketing as well as other procedures in the disposition of the proposal leading to a conclusion that the carriers exercised no independent judgment.

We do not, however, agree with petitioners' argument that *Pork Skins* and this court's affirmance of that decision did not decide the statutory issue of whether a *sua sponte* employee recommendation of a proposal constitutes a *per se* violation of the employee docketing ban even if the carrier members exercise independent judgment in voting on whether to docket the proposal. *See* Reply Brief for Petitioners at 22. The Commission unequivocally stated that the MCA's employee docketing ban barred employee initiated proposals (*i.e.*, a *sua sponte* employee recommendation to docket a proposal). *See Pork Skins* at 5 ("The MCA intended that carriers or shippers, not rate bureau employees, initiate classification proposals.... The fact that NCRC formally approved the docketing fails to override the fact that the NCB actually originated the proposal."). Accordingly, we find unpersuasive petitioners' assertion, based on semantic quibbling, that the NCB did not *initiate* any proposals but only made recommendations which were then *docketed* or, in petitioners' view, *initiated* by a vote of the carriers.

their amended procedures conform with the MCA and its legislative history and that the ICC had therefore exceeded its statutory authority by cancelling the tariffs. This court affirmed the ICC's decision without opinion. *National Classification Comm. and Nat'l Motor Freight Ass'n, Inc. v. United States,* 737 F.2d 1206 (D.C. Cir.1984) ("No. 83–1866") ("This court is in agreement with the result reached by the Commission, generally for the reasons stated in its Decision dated July 20, 1983...."). On August 2, 1984, this court denied petitioners' petition for rehearing and suggestion for rehearing *en banc.* The Supreme Court denied certiorari on February 19, 1985. *See* —— U.S. ——, 105 S.Ct. 1174, 84 L.Ed.2d 324 (1985).

In September 1983, after the *Pork Skins* decision but before this court decided No. 83–1866, the Commission issued a show cause order requiring petitioners to

> provide a list of all classification proposals initiated by the NCC after May 26, 1981, identifying any tariff items published pursuant to these proposals and shall show cause why such items should not be ordered rejected or canceled.

*Reclassification Procedures—National Classification Comm.,* No. 39509 (Sept. 23, 1983) ("show cause order"), J.A. at 3. The Commission issued the show cause order because "[e]vidence submitted in [the *Pork Skins* ] proceeding suggests that other classification proposals have been docketed in the name of NCC since May 26, 1981, and that they were handled under the same procedures as the pork skins and bacon rinds proposal." *Id.* Petitioners responded to the show cause order on January 30, 1984, with a list of all classification proposals docketed by the NCC since May 26, 1981. *See* Response to Show Cause Order and Request for Oral Hearing, No. 39509 (Jan. 30, 1984), J.A. at 16–35. In their response, the petitioners did not attempt to demonstrate that any of the listed proposals were handled in a manner different from the procedures used in *Pork Skins.* Instead the petitioners relied on their assertion that this court would vindicate their procedures on appeal. *Id.* 18–19 ("Should the NCC prevail in [No. 83–1866], the sole predicate for this proceeding will have been overturned."); *see also* Motion to Extend Compliance Date of Show Cause Order, No. 39509 (Jan. 20, 1984), J.A. at 10–11 (The basis for NCC's request to hold the show cause proceeding in abeyance is "that the substantive legal issues regarding the NCC's procedures raised in this proceeding will be resolved by the Court's decision in ... No. 83–1866, presently before the United States Court of Appeals for the District of Columbia.").

On May 17, 1984, the Commission entered its final decision in the show cause proceeding ordering petitioners to cancel all tariff items published pursuant to classification proposals initiated by the NCC after May 26, 1981. *See Reclassification Procedures—National Classification Comm.,* No. 39509 (May 11, 1984), J.A. at 36. This appeal followed.[4]

---

**4.** One of the tariff items ordered cancelled as a result of the show cause proceeding was also the subject of a separate proceeding. As a result of a shipper complaint, the Commission, on April 5, 1984, voted separately to suspend and investigate a proposed reclassification of rawhide dog chews because the proposal appeared to violate 49 U.S.C. § 10706(b)(3)(B)(iv), (v). *See* J.A. at 125–26. Petitioners filed a motion to vacate the suspension and discontinue the investigation on April 26, 1984. *See* Petition Seeking Vacation of Suspension and Termination of Investigation (April 26, 1984) ("Vacation Petition"), J.A. at 128. On May 29, 1984, the Commission denied petitioners' motion and ordered the tariff item relating to rawhide dog chews cancelled, taking official notice of its decision in the show cause proceeding. *See Density Ratings on Rawhide*

*Dog Chews, NMFC, April 7, 1984,* No. M–30368 (May 23, 1984), J.A. at 366. Petitioners filed a petition for review in this court together with an unopposed motion for consolidation with their petition for review of the ICC's decision in the show cause proceeding. This court consolidated the two proceedings by order entered July 26, 1984.

We note that petitioners did attempt to argue before the Commission in their petition to vacate the suspension of the tariff items relating to rawhide dog chews that the Commission's *Pork Skins* decision could not be applied to the facts of the dog chew proceeding. *See* Vacation Petition, J.A. at 140–45. We find the purported factual differences cited, however, to be irrelevant to the statutory interpretation question

## II. DISCUSSION

The issue raised by petitioners in this case is a pure legal question of statutory interpretation: Did the ICC exceed its statutory authority when it ordered certain tariff items cancelled because petitioners' reclassification procedures violate the employee docketing ban in 49 U.S.C. § 10706(b)(3)(B)(iv) and the requirement for disclosure of a classification proponent's identity in 49 U.S.C. § 10706(b)(3)(B)(v)? Petitioners in their opening brief expressly so state and we agree.

> [T]he Commission has colaterally [sic] attacked the procedures authorized in petitioners' agreement by ordering the cancellation of tariff items published pursuant to those procedures. The issue before the Court, therefore, *does not revolve around the particular tariff items ordered cancelled but whether the procedures authorized by petitioners' agreement conform to the statutory changes required by Congress.* If, as petitioners contend, the procedures used in establishing the individual tariff items are not prohibited by the new Act, then the Commission has exceeded its statutory authority in ordering those items cancelled. This issue requires the Court to interpret the meaning of two statutory provisions, a task that is routinely performed by the Courts.

Brief for Petitioners at 14 (emphasis added). We find, however, that this court has already answered the question definitively in its decision in No. 83–1866.

In *Pork Skins,* the ICC determined that the petitioners' amended procedures, in particular employee initiation of proposals and collective docketing of such proposals in the name of the NCC, violated section 14 of the MCA, 49 U.S.C. § 10706(b)(3)(B)(iv), (v). Petitioners appealed to this court, arguing that the Commission erred in finding that their procedures violated the MCA. In No. 83–1866, we affirmed the Commission's

decision on the basis of the Commission's reasoning. The Commission cancelled the tariff items in the show cause proceeding appealed here because the tariffs were approved pursuant to the same procedures found unlawful in *Pork Skins.* Petitioners did not argue in the show cause proceeding that the procedures used with respect to the tariff items at issue were materially different than those used in *Pork Skins;* instead they relied on the assertion that the procedures used in *Pork Skins* were valid and that this court would so determine on appeal. *See supra* p. 169. Unfortunately for petitioners, this court on appeal upheld the Commission's determination that these same procedures violated the MCA.

Less than a year after this court's decision in No. 83–1866, petitioners are here once again attempting to litigate the validity of the Commission's determination that the amended procedures used to reclassify the tariff items in *Pork Skins* (and the show cause proceeding) violate the provisions of section 14 of the MCA. Petitioners litigated the issue of the validity of their procedures before this court in No. 83–1866 in a direct challenge to the *Pork Skins* decision and lost. Petitioners are thus precluded from relitigating the same issue via a challenge to the Commission's application of the principles established in *Pork Skins* to offer tariff items. *See generally* Restatement (Second) of Judgments § 27 (1982) (setting forth general rule of collateral estoppel or issue preclusion).

This case is similar to *Western Coal Traffic League v. ICC,* 735 F.2d 1408 (D.C. Cir.1984). In that case, the petitioners challenged the ICC's standards when they were first established and then came back to challenge them again when they were first applied. This court stated:

> [Petitioners] are precluded from relitigating in these cases the very same issues

here (*i.e.,* whether the proposal was appealed and whether or when the protestant actually requested the proponent's identity—given that no argument is made that the proposal had a carrier or shipper proponent), or to be based on

petitioners' own narrow interpretation of the issues decided in *Pork Skins* which we find unpersuasive. *See supra* note 3; *infra* pp. 170–71 & note 5.

they unsuccessfully pressed in *Bessemer* [*v. ICC,* 691 F.2d 1104 (3d Cir.1982)] ....

Petitioners would have the Commission reconsider the Ex Parte No. 393 standards and procedures ... prior to each application.

*Id.* at 1410; *cf. Montana v. United States,* 440 U.S. 147, 157–62, 99 S.Ct. 970, 975–78, 59 L.Ed.2d 210 (1979) (judgment predicated upon one set of contracts estopped litigation of legal issues in another case dealing with a similar, though unrelated set of contracts, because there had been no changes in facts or controlling law essential to the judgment); *FTC v. Ruberoid Co.,* 343 U.S. 470, 476, 72 S.Ct. 800, 804, 96 L.Ed. 1081 (1952) (issues settled in a prior proceeding by an order of the FTC affirmed in the courts may not be relitigated). Similarly, in the present case, petitioners challenged the ICC's initial decision in *Pork Skins* to cancel two tariff items because the amended procedures under which the proposals were handled failed to conform with the changes required by the MCA; now petitioners are back to challenge the application of that decision to other tariff proposals allegedly handled under the same procedures. The Commission unequivocally determined that employee initiation of proposals and subsequent collective docketing in the name of the NCC violated 49 U.S.C. § 10706(b)(3)(B)(iv), (v) in *Pork Skins,* and we affirmed that decision. The petitioners are not entitled to an opportunity to relitigate the statutory validity of the procedures determined unlawful in *Pork Skins* each time the Commission cancels a tariff proposal handled under those procedures.

While, as an unpublished opinion, this court's decision in No. 83–1866 has no precedential effect with respect to other parties, it is binding as a final judgment with respect to petitioners. Local Rule 8(f) provides:

Unpublished orders, including explanatory memorandum of this Court, are not

to be cited in briefs or memorandum of counsel as precedents. However, counsel may refer to such orders and memorandum for such purposes as application of the doctrines of res judicata, collateral estoppel and law of the case, which turn on the binding effect of the judgment, and not on its quality as precedent.

D.C.Cir.R. 8(f). *See Micklus v. Greer,* 705 F.2d 314, 317 n. 4 (8th Cir.1983) (giving preclusive effect to an unpublished decision of the Seventh Circuit); *Springfield Television Corp. v. FCC,* 609 F.2d 1014, 1019 (1st Cir.1979) (giving preclusive effect to an unpublished decision of the D.C.Circuit). Thus petitioners are precluded from relitigating the same issues decided in No. 83–1866 unless an exception to issue preclusion applies.

Petitioners assert that collateral estoppel does not apply here because there has been a change in controlling facts and legal principles. *See* Reply Brief for Petitioners at 18 (citing *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984)); *see generally* Restatement (Second) of Judgments § 28 (1982) (listing exceptions to issue preclusion). We find petitioners' contentions unpersuasive.

Petitioners attempt in their reply brief to argue that the Commission's determination in *Pork Skins* was limited to "the facts in that case." We note at the outset that this assertion conflicts with their position in their opening brief that the issue in this case is "whether the procedures authorized by petitioners' agreement conform to the statutory changes required by Congress" —a question of statutory interpretation. *See supra* p. 169. Whatever petitioners' final characterization, the ICC's determination that employee initiation of proposals and the collective docketing of such proposals in the name of the NCC violate section 14 of the MCA, *see Pork Skins* at 4–6, was a *per se* legal determination not limited to any special facts in the *Pork Skins* proceeding.[5]

---

5. We note that petitioners did not attempt to demonstrate in the show cause proceeding that the procedures used to handle the tariffs at issue

were in fact materially different than those used in *Pork Skins;* instead, petitioners throughout the proceedings have relied on the argument

Petitioners, nevertheless, attempt to argue that the determinations made in *Pork Skins* were dependent on the Commission's overall factual finding that the carriers had exercised no independent judgment. *See* Reply Brief for Petitioners at 18. Accordingly, they seek to distinguish the tariffs at issue here by citing to the numerous affidavits filed in the show cause proceeding by carrier members attesting to their exercise of independent judgment. In particular, petitioners argue that employee initiation of proposals is permissible if the carrier members exercise independent judgment in voting to docket the proposal, and that the requirement that the proposal's proponent be divulged may be met by divulging the names of the carriers voting to docket the proposal. This contention is clearly contrary to the Commission's unequivocal and unqualified determination that employee initiation of proposals and collective docketing of such proposals in the name of the NCC violate the provisions of section 14. *See Pork Skins* at 5; *see also id.* at 8 (disclosure of member votes is a separate statutory requirement and a distinct requisite for approval); *supra* note 3. This is a *per se* determination based upon the Commission's interpretation of the language of section 14 and congressional intent as evidenced by the legislative history of the MCA.

We note that the language relied upon by petitioners to support their argument that the Commission's conclusion was dependent on its finding that the carriers exercised no independent judgment occurs not in the Commission's discussion of the docketing procedures but in the second part of the Commission's opinion discussing the propriety of the NCB recommendation and the use of mail voting—neither of which is *per se* impermissible. As dis-

cussed earlier, the Commission's conclusion that these practices were impermissible in *Pork Skins* did turn on its finding that, when occurring in conjunction with the other procedures found to violate 49 U.S.C. § 10706(b)(3)(B), employee recommendations and mail voting tend further to encourage or facilitate rubberstamping by the carriers in violation of the principle of carrier responsibility for classification decisions. *See supra* pp. 166–168 & note 3. Despite the inherent opacity of a decision without opinion, we find that this court's affirmance of *Pork Skins* in No. 83–1866 necessarily decided that the Commission reasonably interpreted section 10706(b)(3)(B)(iv), (v) to ban employee initiation of proposals and collective docketing of such proposals. There is simply no reasonable alternative conclusion. The Commission unequivocally determined that the docketing procedures used by petitioners violated the MCA. Although the Commission found that procedures used in the disposition of the docketed proposal also violated the intent of the MCA or the implementing regulations, these determinations were stated as additional reasons for cancelling the tariff item which were dependent upon or followed from the Commission's initial determination that the docketing procedures were unlawful. *See id.*

Petitioners also assert that the controlling law has changed. As support, petitioners cite cases decided by the Commission after *Pork Skins* which petitioners claim are inconsistent with *Pork Skins* because they approve docketing by carrier committees. *See* Reply Brief for Petitioners at 19. Petitioners, however, filed a supplemental brief in No. 83–1866 bringing all but one of the decisions cited in its reply brief to the court's attention, *see* Supplemental Brief for Petitioners, No. 83–1866 (filed May 15,

that their amended procedures, in particular employee initiation of proposals and collective docketing, do conform to the conditions established in section 14 of the MCA. *See, e.g.,* Petitioners' Petition for Stay Pending Judicial Review, No. 39509, J.A. at 51 ("The question presented is one of pure law and is based solely

on statutory interpretation of Section 10706."); *supra* p. 168. If the procedures used to handle the reclassifications at issue in the show cause proceeding were materially different than those used in *Pork Skins,* the place to raise the issue was before the ICC in the show cause proceeding.

1984),[6] thus this court was aware of these decisions when it rendered judgment in No. 83–1866.

Petitioners further argue that the Supreme Court in *ICC v. American Trucking Ass'n, Inc.*, —— U.S. ——, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), "interpreted Section 14 of the Motor Carrier Act and found that it is self-serving and so precise that the carriers themselves will know whether they are violating the procedural requirements of the Act." Reply Brief for Petitioners at 19. We find petitioners' characterization of the Supreme Court's decision in *American Trucking* fallacious. Placed in context, the Court stated:

> To some degree, § 14 is self-enforcing.... However, the procedures governing the administration of § 14 demonstrate that Congress envisioned that the Commission—and not the threat of antitrust liability—would be the primary enforcer of the guidelines. It is, after all, the Commission that decides which bureau agreements conform to the dictates of § 14. It is the Commission that is empowered to terminate or suspend rate-bureau agreements. And, it is the Commission that may impose conditions on rate-bureau agreements in order to further National Transportation Policy.

*American Trucking*, 104 S.Ct. at 2466–67 (citations and footnote omitted). We find that neither *American Trucking* nor the ICC decisions cited by petitioners establishes a relevant change in law justifying an exception to the general rule of issue preclusion.

### CONCLUSION

This court decided the issues raised by petitioners in this appeal in No. 83–1866.[7] Petitioners have failed to establish any grounds sufficient to warrant an exception to the rule of issue preclusion. Accordingly, the petitions for review are

*Denied.*

Separate Statement of *Circuit Judge* WALD:

While I agree that this court's decision in *National Classification Comm. and Nat'l Motor Freight Ass'n, Inc. v. United States*, 737 2d 1206 (D.C.Cir.1984) ("No. 83–1866"), affirming by judgment without opinion the Commission's construction of 49 U.S.C. § 10706(b)(3)(B)(iv), (v), precludes petitioners from relitigating the issues in this case. I want, nevertheless, to express my concerns about the manner in which No. 83–1866 was decided. In my view, it did not present the type of case appropriate for disposition without a published opinion. Indeed, the present case testifies to the unfortunate by-products of the overuse of this rapidly growing mode of disposition.

Although the heavy caseload in this court necessitates the disposition of a large percentage of cases by order or short unpublished memorandum opinions,[1] serious

---

**6.** Petitioners cite several unprinted decisions provisionally approving other rate bureau agreements. *See* Section 5a Application No. 25, The New England Motor Rate Bureau, Inc.—Agreement (NEMRB) (April 23, 1984); Section 5a Application No. 60, Rocky Mountain Motor Tariff Bureau, Inc.—Agreement (April 3, 1984); Section 5a Application No. 33, Central States Motor Freight Bureau, Inc.—Agreement (May 1, 1984); Section 5a Application No. 48, Eastern Central Motor Carriers Association, Inc.—Agreement (April 19, 1984). The ICC filed a supplemental brief in No. 83–1866 distinguishing the procedures allowed pursuant to these agreements. *See* Joint Response to Petitioners' Supplemental Brief, No. 83–1866 (filed May 22, 1984). The remaining decision cited, apparently not brought to the court's attention in No. 83–1866, is an unprinted ICC refusal to suspend or investigate a rate proposal challenged as being docketed by a carrier committee. *See* Reply Brief for Petitioners at 20 (citing Suspension Case No. 71188, General Increase, E.C.M.C.A. (September 13, 1984)).

**7.** We note that this court's decision in No. 83–1866 is binding only on petitioners and has no precedential effect with respect to other rate bureaus. Thus the Commission's interpretation of section 14 set forth in *Pork Skins* could be challenged by these other rate bureaus when applied to them, and this court would be free to consider *de novo* the reasonableness of the Commission's interpretation of section 10706(b)(3)(B)(iv), (v).

**1.** According to statistics compiled by the Clerk's Office and the Circuit Executive, roughly be-

questions continue to be raised about the circumstances in which it is appropriate for this court to dispose of cases in such a truncated manner. *See* Report and Recommendations of the Advisory Committee on Procedures Concerning Unpublished Dispositions by the United States Court of Appeals for the District of Columbia Circuit (June 8, 1984) ("Advisory Committee Report").[2] In the fall of 1983, a subcommittee was appointed by the Chairman of the Advisory Committee on procedures to this court to examine the court's practice of rendering unpublished decisions. After reviewing the unpublished decisions issued by the court in 1983, the subcommittee concluded that 40 percent of the decisions arguably should have been published under the court's governing criteria. *See* Report of the Subcommittee on Unpublished Opinions of the Advisory Committee on Procedures to the United States Court of Appeals for the District of Columbia Circuit 45 (May 1984) ("Subcommittee Report").[3] With respect to administrative law or agency cases, the subcommittee specifically found:

> Slightly less than half the published opinions and one judgment order ... argu-

ably do not satisfy the court's criteria for nonpublication. Most of the opinions in this category addressed substantive legal issues, *e.g.*, an agency interpretation of a statute. Many of these issues appear to have been matters of first impression in this Circuit.... Although some of the issues may not be of great general public interest, each of these cases is significant to a certain constituency.

*Id.* at 48. As a result of the subcommittee's report, the Advisory Committee recommended that the court incorporate more precise and objective criteria for publication into the Rules of the Court. *See* Advisory Committee Report at 2. On February 28, 1985, the court issued a proposed amendment to Local Rule 13 ("Publication of Opinions") establishing criteria for the publication of opinions. *See* 113 Daily Wash.L.Rep. 539, 541–42 (March 19, 1985). Under the proposed Rule 13, an opinion shall be published if it meets one or more of seven criteria. Of specific relevance here is the first criteria stated: "(1) with regard to a substantial issue it resolves, it is a case of first impression or the first

---

**2.** A number of commentators have raised concerns about disposing of cases by unpublished opinion, primarily focusing on the "pernicious effect" of the practice on judicial responsibility. *See, e.g.*, Reynolds & Richman, An Evaluation of Limited Publication in the United States Courts of Appeals: The Price of Reform, 48 U.Chi.L. Rev. 573 (1981); *see also* R. Posner, The Federal Courts: Crisis and Reform, at 122–23 (1985) (summarizing arguments for publication of all opinions). Specifically it is argued that unpublished opinions: result in less carefully prepared or soundly reasoned opinions; reduce judicial accountability; increase the risk of non-uniformity; allow difficult issues to be swept under the carpet; and result in a body of "secret law" practically inaccessible to many lawyers. Furthermore, there is no uniformly enforced or practiced guidelines for making the publication decision; hence judges exercise considerable

tween one-third to one-half of this court's decisions each year are disposed of by order of judgment alone or accompanied by a brief unpublished and uncitable memorandum. In statistical year 1982 (July 1, 1981—June 30, 1982), 51% of this court's 627 decisions were unpublished as compared to 32.8% of this court's 533 decisions in statistical year 1984.

discretion in deciding when an opinion should be published, *i.e.*, when an opinion will become law. *See* Wald, The Problem with the Courts: Black-Robed Bureaucracy or Collegiality Under Challenge?, 42 Md.L.Rev. 766, 781–84 (1983).

**3.** The publication criteria referred to by the subcommittee were adopted by the court in 1973 but were never codified in the Rules of the Court. The revised plan adopted in 1973 states that an opinion will be published if one of the following criteria is satisfied:

> a. It establishes a rule of law on a point of first impression for the court, or alters or modifies a rule of law previously announced.
> b. It involves a legal issue of unusual or continuing public interest.
> c. It criticizes existing law.
> d. It is considered a significant contribution to legal literature, *e.g.*, through historical resolution of an apparent conflict in opinions, by furnishing an analysis of the rationale and policy or content of a rule of law.
> e. It applies an established rule of law to a factual situation significantly different from that in published cases.

*See* Subcommittee Report at 7 (quoting Plan for Publication of Opinions (Apr. 17, 1973)).

case to present the issue in this Circuit." Cases of first impression are likewise subject to publication under the publication criteria adopted by this court in 1973. *See supra* note 3.

The Interstate Commerce Commission ("ICC" or "Commission") decision in *Reclassification of Pork Skins and Bacon Rinds, NMFC, August 1982*, No. M–30360 (1983) ("*Pork Skins*"), affirmed in No. 83–1866, presented this court with a case of first impression involving a substantial question of statutory interpretation—the reasonableness of the Commission's interpretation of the conditions placed upon the rate bureau process by section 14 of the Motor Carrier Act of 1980 ("the MCA" or "the Act"), 49 U.S.C. § 10706(b)(3)(B). Furthermore, the Commission's interpretation of section 14 of the MCA in *Pork Skins* is not compelled by the plain language of the Act but requires an examination of Congress' purpose and intent in enacting section 14 as evidenced in the legislative history, which itself is neither extensive nor clearly definitive. Finally, the Commission's interpretation of the requirements of section 14 is of interest not only to petitioners but to all rate bureaus who must conform their collective ratemaking procedures to the requirements of section 14. Given these circumstances, a published opinion setting forth the court's analysis and reasoning for upholding the Commission, and establishing a precedent applicable to all rate bureaus, not just petitioners, should in my view have been written.

The court's incorporation by reference of the Commission's reasoning is not, I believe, a sufficient substitute for a published opinion of the court. Affirming an agency on the basis of the agency's decision is quite a different matter than affirming a district court on the basis of its opinion. In the latter case, the parties have had the benefit of an independent judicial decision whereas in the former the parties are seeking judicial review of the agency decision in the first instance in this court. When a novel and substantial issue of statutory interpretation is at stake, I believe this court should at least give the parties a

statement of reasons in the court's own words, if for no other reason than to indicate that the court in fact thoughtfully reviewed the agency's determination. Moreover, judicial decisions are likely to be more accessible than agency decisions—a factor which deserves consideration when a case involves a statutory construction question of interest to a particular constituency. *See generally* Reynolds & Richman, *supra* note 2, at 602–03 (decisions by reference tend to inhibit public scrutiny of the appellate process and leave litigants feeling that the appellate court never really gave the case a fresh look). As a final practical consideration, the parties have little chance of prevailing on a suggestion for rehearing *en banc* in this court or a petition for *certiorari* in the Supreme Court when the court renders judgment with no opinion. Given the large number of suggestions for rehearing *en banc* which come through the court in a year—244 during 1984—an unpublished opinion with no precedential effect and no opinion to highlight the issues and reasoning of the court is not likely to draw significant attention from the overburdened judges in our court. *See generally* Reynolds & Richman, The Non-Precedential Precedent—Limited Publication and No-Citation Rules in the United States Court of Appeals, 78 Colum.L.Rev. 1167, 1203 (discussing reasons why unpublished opinions are less likely to be reviewed by the Supreme Court).

If the publication criteria had been followed and an opinion issued in No. 83–1866, the present appeal might well have been entirely avoided. A published opinion stating the court's analysis, even if it substantially rehearsed the Commission's reasoning, would have left the petitioners with no doubt that the issues had been decided. Instead, both the parties and this court have been put through the time and expense of a fruitless second appeal. And still this is not the end. Being unpublished, No. 83–1866 has no precedential effect. Thus it is highly likely that another rate bureau will again call upon this court to decide the same statutory questions, *e.g.,* whether employee initiation of proposals and the collective docketing of such propos-

als violate 49 U.S.C. § 10706(b)(3)(B)(iv), (v). *Cf. Van Drasek v. Lehman,* 762 F.2d 1065, 1068 n. 2 (D.C.Cir.1985) (Although cases are usually transferred to the Federal Circuit by unpublished order, "we issue a published opinion ... to alert litigants ... to the impact of the Federal Courts Improvement Act.").

With a burgeoning caseload, there is little doubt our court, along with others, will resort to summary orders and unpublished opinions with even greater frequency. Thus it is imperative that we scrutinize our selection of those cases to be disposed of without reasons and without precedential effect ever more carefully so as to avoid confusion, repetition, nonuniformity, and even skepticism about the way we do our job. With the incorporation of new publication criteria into the Rules of the Court and a heightened awareness of the need for an explication of our reasons in novel cases to further consistency among our panels and general accountability for our decisions as precedents, I hope that today's dilemma will not repeat itself.