22 F.3d 1174
 306 U.S.App.D.C. 92
 NATIONAL CLASSIFICATION COMMITTEE and National Motor Freight
Traffic Association, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Mallinckrodt Specialty Chemicals Company, et al., The
National Industrial Transportation League, Intervenors.
 No. 92-1212.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 29, 1993.
Decided May 17, 1994.
 
 Petition for Review of an Order of the Interstate Commerce Commission.
 William W. Pugh, Alexandria, VA, argued the cause, for petitioners. On brief, was John R. Bagileo, Washington, DC. Rosalind C. Cohen, Washington, DC, entered an appearance.
 Michael Martin, Atty., I.C.C., Washington, DC, argued the cause, for respondents. On brief, were Robert S. Burk, Gen. Counsel, I.C.C., Craig M. Keats, Associate Gen. Counsel, I.C.C., and Robert B. Nicholson and John P. Fonte, Attys., Dept. of Justice, Washington, DC.
 Daniel J. Sweeney, Washington, DC, argued the cause, for intervenors. On the joint brief, were Richard D. Fortin and Nicholas J. DiMichael, Washington, DC.
 Before MIKVA, Chief Judge; WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.
 Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 
 1
 The National Classification Committee (NCC) seeks review of a decision by the Interstate Commerce Commission (ICC or Commission) ordering the NCC to cancel tariffs reclassifying certain acids that are designated as hazardous by the United States Department of Transportation and are transported by motor common carriers. Because the Commission reasonably concluded that the reclassification violates 49 U.S.C. Sec. 10706(b)(3)(C), we deny the NCC's petition for review.
 
 I.
 
 2
 The NCC is a standing committee of the National Motor Freight Traffic Association, a trade association whose members include roughly one thousand motor common carriers. The NCC is responsible for publishing the principal classification tariff, the National Motor Freight Classification (NMFC), used by motor common carriers to establish class rate tariffs. The NMFC groups commodities with similar transportation characteristics into divisions referred to as "classifications." Each classification is assigned a number called a "classification rating." The more difficult or costly it is to transport a commodity, the higher the classification rating of the commodity.
 
 
 3
 Although the NMFC itself does not establish trucking rates, it plays a significant role in the rate-setting process. Class rate tariffs incorporate the NMFC's classifications and establish rates on a classification by classification basis for transporting goods between specific locations. Generally, the higher the classification rating, the higher the rate the shipper pays for transportation. Class rate tariffs may be published either by a carrier individually or by a carrier rate bureau.
 
 
 4
 Historically Congress has excepted entities engaged in collective ratemaking from antitrust liability. See Reed-Bulwinkle Act, Pub.L. No. 90-662, 62 Stat. 472 (1948) (current version at 49 U.S.C. Sec. 10706). Motor common carriers can enter into agreements with each other regarding both classifications and rates and if the ICC approves the agreements the antitrust laws "do not apply ... with respect to making or carrying out the agreement." 49 U.S.C. Sec. 10706(b)(2). In the era of deregulation, however, Congress has narrowed the range of permissible collective ratemaking activities. See generally Household Goods Forwarders Tariff Bureau v. Interstate Commerce Comm'n, 968 F.2d 81, 82 (D.C.Cir.1992); National Classification Comm. v. United States, 765 F.2d 164, 166 (D.C.Cir.1985). Of relevance here, the Motor Carrier Act of 1980 (MCA 80 or the Act) prohibits collective action regarding "released rates." 49 U.S.C. Sec. 10706(b)(3)(C) ("No agreement approved under this subsection may provide for discussion of or voting on [released] rates...."). A carrier offers a released value rate when it charges the shipper a discounted rate in exchange for a limitation on the carrier's liability in the event of loss or damage. In contrast, when a carrier charges a full value rate, it assumes liability for the full value of any loss or damage.
 
 
 5
 The petition for review arises from the NCC's proposal to change the classification rating of acids designated hazardous by the United States Department of Transportation (DOT). In the past, all acids were grouped into a single classification encompassing applicable subclassifications for released rates. The NCC's proposal would change hazardous acids from the generic acids classification to a new, more specific classification that would not include subclassifications for released rates. The proposed change would result in the cancellation of all collectively established released rates for the reclassified acids. The NCC argues that the reclassification is necessary so that carriers are adequately compensated for the increased costs they must incur in complying with the DOT's more rigorous requirements for the transportation of hazardous acids.
 
 
 6
 Several individual shippers and shipper groups challenged the NCC's proposed reclassification before the ICC. In response, the ICC suspended the effectiveness of the proposed classification change pending a determination of its legality. The ICC ultimately concluded that the NCC's proposed reclassification resulted from proscribed collective action on released rates in violation of 49 U.S.C. Sec. 10706(b)(3)(C). Classification Rating on Acids, NMFC, March 1992, No. M-30424 at 4, reprinted at Joint Appendix (J.A.) 375. As an alternative ground for its holding, the ICC found that the NCC's proposed reclassification was not reasonable, as required by49 U.S.C. Sec. 10701(a), because the NCC had not shown any substantial change in the transportation characteristics of hazardous acids necessitating a change in classification. Id.[1]
 
 
 7
 The petition for review requires us to decide whether, as the NCC argues, section 10706(b)(3)(C) prohibits only collective ratemaking with respect to released value rates or whether, as the ICC concluded, that section also prohibits collective classification changes that have the effect of cancelling existing released rates.
 
 II.
 
 8
 Congress has not made clear whether section 10706(b)(3)(C) prohibits only collective action on released rates or whether its reach extends to classifications that have the effect of cancelling existing released rates. Because it has implicitly left this gap for the ICC to fill, we will uphold the Commission's interpretation of the Act, that is, that section 10706(b)(3)(C) prohibits collective action on classification changes that affect released rates, so long as it is reasonable. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984).
 
 
 9
 We conclude that the ICC's interpretation of MCA 80 is reasonable. It is beyond dispute that the NCC's proposed reclassification is the result of collective action.[2] Furthermore, the reclassification cancels existing released rates just as effectively as a direct vote would. The NCC proposes to move the designated hazardous acids from a general category which includes subclassifications for acids shipped at released rates to a distinct category which does not include a subclassification for released rates. Because class rate tariffs assign rates only to classifications contained in the NMFC, the absence of a released rate classification for the designated hazardous acids in the NMFC means that class rate tariffs will not include released rates for the acids. In other words, the proposed reclassification will result in the assignment of full value rates to acids previously assigned both full value and released rates. Because the proposed reclassification results from collective action and has the effect of cancelling existing released rates, we hold that the ICC reasonably concluded that section 10706(b)(3)(C) bars it.
 
 
 10
 We are not persuaded by the NCC's arguments to the contrary. The NCC first argues that the ICC's interpretation of section 10706(b)(3)(C) is unreasonable because it is inconsistent with the ICC's interpretation when it originally approved the NCC's classification-making agreement. After the enactment of MCA 80, the NCC revised its classification-making agreement to conform it to the Act. The NCC submitted its agreement to the ICC for approval as required by the Act. See 49 U.S.C. Sec. 10706(a)(2)(A). The NCC also requested the ICC to interpret the precise scope of section 10706(b)(3)(C)'s prohibition on collective action regarding released rates. Specifically, the NCC asked whether it would run afoul of section 10706(b)(3)(C) if it entertained
 
 
 11
 a proposal recently made by a shipper to establish a full value rating of class 60 for a product described as 'acid spill cleanup products' notwithstanding that that commodity is presently embraced in NMFC item 60000, which provides class 70 for Drugs and Chemicals, NOI, when released to a value of $1.70 per pound.
 
 
 12
 J.A. at 374 n. 8. The proposed reclassification would have made shippers uninterested in shipping the product under a released value agreement since the full rates would actually be lower than the released rates. In one sense, then, the proposal would have "cancelled" the classification applicable to the product when shipped under a released value agreement. But the Commission responded that the NCC could make the proposed reclassification without violating section 10706(b)(3)(C). Decision of the ICC, Section 5a Application No. 61 at 2 (May 2, 1988).
 
 
 13
 Despite the NCC's claim, the ICC's current position does not necessarily contradict its 1988 response to the NCC. Under the default rule contemplated by the 1988 proposal, shippers would have retained the option to ship the product at class 70 under a released value agreement; they would simply have elected not to exercise the option because they could get a better deal by shipping the product at full value. Under the rule contemplated by the NCC's current proposal, by contrast, shippers would have no such choice; the full rates would actually be higher than they used to be but no released value option would be available except through an individual agreement between shipper and carrier. There is a critical difference, however, especially in view of the anti-cartel purpose of section 10706(b)(3)(C), between offering such attractive full rates that shippers themselves lose interest in the existing released rates, on the one hand, and collectively cancelling released rates that shippers might well want, on the other.
 
 
 14
 In fact, the ICC's current position appears to be consistent with its past decisions. Consider, for example, Changes in Rates, Including Rates Based on Released Valuations, MAC, 1984 MCC LEXIS 308, aff'd sub nom. Middle Atlantic Conf. v. United States, 769 F.2d 205 (4th Cir.1985). There, a rate bureau initiated rule changes that had the effect of changing released rates. In an analysis adopted verbatim by the Fourth Circuit, the ICC emphatically rejected the bureau's argument that it had merely voted on "rules" rather than released rates:
 
 
 15
 'Whether a shipper pays a different rate because of a rule change or because of a direct change in the rate, the fact remains that the shipper or receiver pays a different rate. Section 10706(b)(3)(C) ... draws no distinction among the different ways in which rates can be changed and Congress did not intend that any such distinction be made. Congress' only intent was to remove the collective setting of released rates from the scope of permissible collective ratemaking. The changes resulting from [the bureau's] proposal affect the level of released rates ultimately paid by shippers and receivers, and constitute collective ratemaking in violation of Section 10706(b)(3)(C).'
 
 
 16
 Id. at 206.
 
 
 17
 Even if the ICC's interpretation of section 10706(b)(3)(C) has changed since 1988, no rule of law prevents such a change. Rather, an agency may depart from its past interpretation so long as it provides a reasoned basis for the change. Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). We believe that the ICC has provided a reasoned basis. Its current interpretation carries out Congressional intent as expressed in MCA 80. Congress clearly intended section 10706(b)(3)(C) to end collective action on released rates. See National Classification Comm. v. United States, 765 F.2d 164, 166 (D.C.Cir.1985). If the ICC interpreted the section to allow classification changes that have the effect of cancelling existing released rates, like the one at issue here, Congress might as well have never enacted section 10706(b)(3)(C) because its prohibition would be virtually meaningless.
 
 
 18
 The NCC also argues that the ICC's interpretation of MCA 80 is unreasonable because it effectively freezes classifications that are no longer reasonable. Section 10706(b)(3)(C), however, does not prohibit individual carriers from changing released rate classifications either directly or by reclassifying full value rates with the ancillary effect of cancelling released rates contained thereunder. Indeed, individual carriers must change their rates or classifications if they become unreasonable. See49 U.S.C. Sec. 10701(a) (rates and classifications must be reasonable). In fact, when Congress enacted MCA 80, it intended classification changes to be made at the individual carrier level rather than collectively. See National Classification Comm. v. United States, 765 F.2d 164, 166 (D.C.Cir.1985) (quoting Reclassification of Pork Skins & Bacon Rinds, NMFC, No. M-30360 (1983)) (Congress "sought, among other things, to place the open responsibility for rate and classification changes on individual carriers."). Therefore, the ICC's interpretation does not freeze current classifications--it requires only, as Congress intended, that individual carriers make classification changes if the changes have the effect of cancelling released rates.
 
 
 19
 Finally, the NCC argues that the course directed by the ICC in effect forces it to violate the law by reestablishing its released rates collectively. The NCC argues that if it wants to reclassify the designated hazardous acids while leaving the released rate provisions intact, it can do so only by collectively voting to carry the pre-existing released rates over into the new classification. To do so, however, according to the NCC, would be a clear violation of section 10706(b)(3)(C). The NCC's argument mischaracterizes the ICC's decision. The ICC did one thing only--it ordered the NCC to cancel the tariff reclassifying hazardous acids. The ICC in no way directed the NCC to change the full value classification for hazardous acids and then vote collectively to reinstate the pre-existing released rate classifications. Rather, the ICC declared:
 
 
 20
 If a carrier wishes to increase its rates for a particular released value level, it is free to do so individually. If it wants to eliminate the released value entirely as to certain commodities, it is also free to do so. What it cannot do under the statute is establish, change, or (as here) cancel released rates collectively.
 
 
 21
 Decision of the Interstate Commerce Commission, Investigation and Suspension Docket No. M-30424, Classification Ratings on Acids, NMFC at 3-4 (March 10, 1992). The course directed by the ICC, then, does not force the NCC to violate MCA 80. To the contrary, the ICC's order that classification changes be made by individual carriers is consistent with Congress's intent in enacting MCA 80. See National Classification Comm. v. United States, 765 F.2d 164, 166 (D.C.Cir.1985).
 
 III.
 
 22
 In summary, we conclude that the ICC's interpretation of section 10706(b)(3)(C) prohibiting collective action on reclassification of released value rates if it has the effect of cancelling released rates is reasonable. Accordingly, the NCC's petition for review is
 
 
 23
 Denied.
 
 
 24
 STEPHEN F. WILLIAMS, Circuit Judge, concurring:
 
 
 25
 I am in general agreement with the majority's opinion, but I write separately because I have a somewhat different understanding of exactly what the NCC did and why it fell afoul of 49 U.S.C. Sec. 10706(b)(3)(C).
 
 
 26
 Under the current version of the National Motor Freight Classification Tariff, some hazardous acids are individually listed in specific classification entries; others are simply lumped into the "generic" entry for acids. In addition to specifying the classification ratings that apply when the acids are shipped at full-value rates, both the individual entries and the generic entry include cross-references to "item 2082", which in turn refers to "item 60000". These cross-references lead the user to classifications that apply when the acids are shipped at a particular "released value", i.e., a specific value to which the shipper's compensation is limited in the event of loss.
 
 
 27
 The new classification entries proposed by the NCC would do two things. They would substantially raise the classification ratings that apply to hazardous acids when shipped at full-value rates. And they would remove the cross-references to "item 2082". As a result, individual carriers would be able to charge released rates for these acids only by specific rate agreements independent of the NMFC tariff classifications.
 
 
 28
 The Commission's conclusion that the collective adoption of this proposal by the NCC's members constitutes "discussion of or voting on [released-value] rates" within the meaning of Sec. 10706(b)(3)(C) seems eminently reasonable to me. The statutory provision plainly prevents motor common carriers from getting together and establishing the default rule that released-value rates for hazardous acids should be 10 percent lower than the applicable full-value rates. It is within the ICC's interpretive province to say that the statutory prohibition also applies when the collectively established default rule goes farther and effectively eliminates altogether the pre-existing mechanism for charging released-value rates.
 
 
 29
 Despite the petitioners' claims, the Commission's order adopting this view is perfectly consistent with Sec. 10706(b)(3)(C). To be sure, the Commission did suggest that the NCC could raise the classification ratings that apply when hazardous acids are transported at full-value rates without disturbing the ratings that apply when the acids are transported at released-value rates. And since the latter set of classification ratings applies only by virtue of cross-references contained in the entries that specify the former set, the NCC could have done so only by incorporating the same cross-references into its new classification entries. The petitioners, suddenly giving Sec. 10706(b)(3)(C) a very broad reading, insist that collective action approving the decision to carry over these pre-existing cross-references would have violated the law. In fact, the petitioners insist that the ICC so held in its order implementing the 1980 Motor Carrier Act. See Ex Parte No. 297 (Sub-No. 5), Motor Carrier Rate Bureaus--Implementation of P.L. 96-296, 364 ICC 464, 496 (1980). This reading of the implementation order is far from self-evident. The same goes for the petitioners' reading of the statute itself: it is not at all clear that the NCC's members would be "voting on [released] rates" if they merely perpetuated the pre-existing classifications that would have applied to released-value shipments even in the absence of any collective action. In any event, as Judge Henderson observes, the ICC simply ordered the NCC to cancel its proposed changes to the NMFC. This directive does not require the NCC to violate the law, even on the NCC's view of the law.
 
 
 30
 Still, the ICC's ruling will have the effect of freezing at least some of the NMFC's existing classifications--those that apply to shipments under released-value agreements. As a result, though changes in technology or regulatory requirements might cause those classifications to be increasingly unreasonable, the NCC will not be able to respond. The NCC therefore suggests that the Commission's ruling will force it to violate 49 U.S.C. Sec. 10701(a), which requires that "[a] rate ..., classification, rule, or practice related to transportation or service provided by a carrier ... must be reasonable".
 
 
 31
 I am not at all sure that Sec. 10701(a) actually does conflict with the ICC's interpretation of Sec. 10706(b)(3)(C). As certain classifications within the NMFC become unreasonable, individual carriers will be obliged to depart from them--not only by the mandate of Sec. 10701(a), but also by obvious necessity in the case of increasing costs, and by whatever competition may exist in the case of decreasing costs. These classifications will thus presumably slide into obsolescence. To the extent that a classification is unused it would not seem to be "related to transportation or service provided by a carrier ", and thus subject to Sec. 10701(a). But even if there is some tension between Sec. 10701(a) and the ICC's interpretation of Sec. 10706(b)(3)(C), the ICC is not obliged to read the former provision to gut the latter.
 
 
 32
 That said, I do think the majority misinterprets our decision in National Classification Committee v. United States, 765 F.2d 164 (D.C.Cir.1985). Despite the majority's frequent references to it, see Maj.Op. at 1175, 1177 and 1178, the case resolved no substantive question of law: the court simply applied issue preclusion against the NCC on the basis of an earlier unpublished opinion upholding the ICC's decision in Reclassification of Pork Skins and Bacon Rinds, NMFC, August 1982, No. M-30360 (1983), aff'd without opinion sub nom. National Classification Committee v. United States, 737 F.2d 1206 (D.C.Cir.1984). Nor, indeed, does Pork Skins itself bear on the case before us now. The relevant part of Pork Skins simply held that the NCC's processes for changing classification entries violated the procedural requirements of the Motor Carrier Act of 1980. Specifically, the Commission held that the initiation of reclassification proposals by a committee of experts working for the NCC, rather than by carriers or shippers themselves, violated 49 U.S.C. Sec. 10706(b)(3)(B)(iv), which declares that the NCC "may not permit one of its employees or any employee committee to docket or act upon any proposal effecting a change in any tariff item published by or for the account of any of its member carriers". The Commission also held that the disclosure requirements of 49 U.S.C. Sec. 10706(b)(3)(B)(v) required reclassification proposals to be attributed to an identifiable carrier or shipper rather than to the NCC as a group. These holdings had nothing to do with Sec. 10706(b)(3)(C): they simply meant that proposals properly subject to collective action had to be initiated by and attributed to identifiable individual companies before they could be acted upon collectively. As this court put it in our 1985 opinion, the pertinent statutory provisions were intended to "assur[e] that the member carriers, rather than the employees [of rate bureaus or the NCC], would play the decisive role in determining collective rates and classifications." National Classification Committee, 765 F.2d at 165.
 
 
 
 [1]
 In view of our holding on section 10706(b)(3)(C), we do not reach the ICC's alternative reasoning
 
 
 [2]
 The carrier members of NCC Classification Panel 3 directed the NCC staff to review the general acid classifications to determine if they took adequate account of the transportation characteristics and restrictions on shipping associated with hazardous acids. J.A. at 283. The NCC staff and carrier members collaborated on the task. Id. Finally, the NCC staff presented its recommendations at two NCC meetings and the carriers evaluated and approved the identified factors, deciding to create different classifications for hazardous and nonhazardous acids. Id. at 284. The factors isolated by the NCC staff with the assistance of the carriers became the basis for the new hazardous acids classification